STAUFFER CHEMICAL COMPANY, a corporation, Appellant (Defendant),

v.

Robert CURRY and Chuck Curry, d/b/a Diamond Ring Farms, Appellees (Plaintiffs).

Robert CURRY and Chuck Curry, d/b/a Diamond Ring Farms, Appellants (Plaintiffs),

v.

STAUFFER CHEMICAL COMPANY, a corporation, Appellee (Defendant).

Nos. 88-84, 88-85.

Supreme Court of Wyoming.

July 28, 1989.

Rehearing Denied Aug. 25, 1989.

Cameron S. Walker and Judith A. Studer, Schwartz, Bon, McCrary & Walker, Casper, for Stauffer.

Donald E. Jones, Jones & Graham, Torrington, for Currys.

THOMAS, Justice.

This appeal is taken from a jury verdict awarding damages for breach of express and implied warranties to the operators of a farming enterprise because of the inefficacy of an insecticide to control western corn rootworms. The primary issues in the appeal by Stauffer Chemical Company (Stauffer) arise from rulings of law made by the trial court with respect to Stauffer's attempts to exclude and limit warranties and from rulings during trial with respect to the admissibility of certain evidence and the scope of cross-examination that Stauffer asserts interfered with the presentation of its theory of the case and its right to a fair trial. Other issues are presented relating to the denial of Stauffer's motion for a directed verdict; the instructions given to the jury; and the award of certain items as

costs. In a cross-appeal, Robert and Chuck Curry, who had done business under the name of Diamond Ring Farms (Currys), assert error with respect to a summary judgment ruling that limited their claims of consequential damages to the loss in value of the 1985 corn crop and related lost profits in their cattle operations following the failure of that crop. Our review of the record in this case discloses no reversible error as to any of the issues presented by the parties. We affirm the judgment of the district court in all respects.

In its appeal, Stauffer asserts the following issues:

"1. Did the District Court err in failing to give effect to the warranty exclusion and limitation of liability printed on the Dyfonate 20–G bag and similar language appearing in promotional literature?

"2. Did the District Court err in restricting the development of defendant's theory of the case by:

"a. Admitting testimony from plaintiffs' marginally qualified experts and then unduly restricting cross-examination;

"b. curtailing defendant's expert testimony on the same issues; and

"c. refusing relevant evidence of corn rootworm test plots and testimony referring thereto?

"3. Did the District Court err in failing to grant defendant's motions for a directed verdict?

"4. Did the District Court err in its jury instructions?

"5. Did the court err in imposing certain costs?"

The Currys make the following statement with respect to the questions presented by the primary appeal:

"Without detracting from appellant's issues which it asks the court to address, appellees would suggest that—

"(1) Appellant's Issue 2 be rewritten to ask:

"2. Did the trial court abuse its discretion in limiting the testimony of expert witnesses as to observations, test data and ratings of corn plants, which evidence was remote in time and place from Curry's 1985 damaged corn fields, with no offer by foundation of comparable controlling conditions?

"(2) The following issues be added:

"A. Did appellant waive its disclaimer of warranty and limitation of damages defense by stating to the jury in closing argument that it would not invoke the disclaimer language on its label?

"B. Did appellant waive its right to now contest the general verdict form for failure to object at trial?"

In their appeal, the Currys assert only one issue:

"Did the lower court err in granting summary judgment to prevent damage claims on lost profits, cessation of business, interest and cost of the product from going to the jury?"

Stauffer restates the issue in the Curry's appeal in this way:

"Did the Court err in granting partial summary judgment limiting plaintiffs' damages to the difference in value of their 1985 crop and attendant lost profits in their cattle operations related to the 1985 crop loss, and dismissing damage claims for prejudgment interest, purchase price of the product, loss of the farm, and future lost profits for 1987 and years following?"

Prior to, and continuing through, the events that culminated in this action, Robert and Chuck Curry ran a farming, livestock raising, and custom cattle feeding enterprise as a father and son partnership under the business name of Diamond Ring Farms. They conducted these operations in the area of Veteran in Goshen County. The "farming unit" consisted of two separate farms, one that had been in the family since 1947 and one that was acquired and incorporated into the enterprise in 1969.

The soil in the area historically had been high in pH levels (indicating alkalinity), and this was true of the two Curry farms. This soil characteristic causes stalks and leaves of most corn plants grown in such soils to manifest a "chlorotic" or "yellowing" appearance. The record indicates that this appearance is attributable to a lack of

iron reaching the stalks and leaves of the corn plants. Adequate iron is essential to the proper growth and production of corn.

In 1983, the Currys made a significant change in their farming methods. Prior to that time, they had followed a system of crop rotation pursuant to which different crops were raised on various segments of their land every year. Diabrotica Virgifera LeConte, generically known as western corn rootworms, were not a problem under the crop rotation practice because the rotation of crops disrupted the life cycle of the worms, which were unable to thrive because they need corn roots for nutrition. The shift in 1983 was from the rotation farming to a system pursuant to which the Currys would grow nothing but corn and alfalfa. The new crop scheme that was implemented with respect to both farms included a plan to grow irrigated "ear" corn repeatedly on the same acreage. In predetermined percentages, some of the corn was to be picked whole for feed and sale, and the balance would be turned into silage by mulching the entire plant. The new farming method was a radical departure from the prior method, and it did entail risks and problems not encountered previously. One of the most significant of the new risks was that the corn rootworm cycle could now be complete because of the continuity of corn crops on the same tracts of land. From this time on, rootworm infestation constituted a major problem.

At the same time, the Currys shifted to a different method of soil preparation for planting. Previously, they had plowed their land with folding of the residue, or "trash," from the prior year's crop back into the ground. In 1983, they began to prepare their soil by a simpler method known as minimum till farming (also called conservation tillage). Farmers using this method simply disc and subsoil the ground. This process does not fold the prior year's crop residue into the ground, but leaves it on the surface instead. The effect of this change was to compound the corn rootworm problem because the "trash" on the surface creates a troublesome condition providing a fertile breeding ground for harmful insects, including the western corn rootworm. The mass of the surface residue also makes it more difficult for applied insecticide to penetrate through the surface and into the roots where it must be present in order to be effective.

In relation to one element of damages, it is important to recognize that, in 1983, the Currys also converted their livestock operation into a different endeavor in which they purchased calves in the fall, wintered them on the feed provided by the farming operation from the previous growing season, grazed them during the summer, and then marketed the yearlings in the fall. The plan assumed that this cycle would repeat each year with the revenue from the sale of the yearlings used to buy the next crop of calves. The Currys were working on a slim margin, like most farmers during these years, and they could not achieve any profit by purchasing feed for the winter from outside sources. The success of their own corn crop was essential in the livestock operation. Currys knew that, if their corn crop should fail in any year, the livestock raising and sales operation also would fail in that year. The Currys' custom cattle feeding service was also dependent on their corn crop. Unless they were able to raise corn in excess of the demands of their own livestock operation, it would not be possible for them to feed cattle for other ranchers at a profit.

The Currys recognized the possible effect of western corn rootworm damage when they instituted the change in their operations, and they sought an effective insecticide to protect their corn crop. In the 1983 season, they selected Dyfonate 20–G (Dyfonate), a product manufactured by Stauffer. One of the reasons for this selection over competing products was the Currys' belief, which was consistent with promotional literature distributed by Stauffer, that Dyfonate would seep down readily through corn "trash" and high pH soil and still be effective upon reaching the roots of the corn plants. Other manufacturers did not claim this same advantage.

In 1983, the Dyfonate seemed to work well and to control the western corn rootworms. In 1984, the Currys again selected

Dyfonate, applied it, and it, again, was effective to protect the corn crop. In both years, the crops were healthy and productive. Consistently, the Currys again used Dyfonate in 1985, but the results were markedly different that year. About the middle of July, the corn seemed to stop growing, became chlorotic, and it began to lean or "lodge" as the condition is described in farming terminology. Virtually all of the plants manifested heavy corn rootworm infestation and severe root pruning by the end of the month. The result for the 1985 growing season was a failure to produce an acceptable yield on the entire acreage planted to corn. The anticipated consequences occurred, and the Currys suffered heavy losses the following winter in their livestock raising and their custom cattle feeding operations. Even though the Currys attempted to mitigate the potential loss by cutting the remaining corn plants into silage, silage is of considerably less economic value than picked "ear" corn.

The record on appeal demonstrates that the Currys consistently used appropriate practices in preparation of their seed beds and application of fertilizers. That practice was followed in 1985. The corn crop germinated normally and, in early June, showed good emergence and color. Normal weather and moisture conditions were present in 1985 in the entire region in which the Currys' farms were located. The record encompasses a contention by Stauffer that perhaps the Dyfonate was not applied properly because investigation disclosed somewhat varying concentrations throughout the planted corn acreage. Beyond that, however, the record contains no material dispute over the quality of application, and the uncontroverted testimony demonstrates that the insecticide was applied in quantities a little heavier than recommended so that it should have been even more effective than with normal application. The facts with respect to farming practices and weather preclude a concern that, in some way, the Currys contributed to the loss of the corn crop or that natural factors such as unusually severe weather may have been a problem.

When the chlorotic appearance and the "lodging" became manifest, a number of efforts were made to identify the cause and provide effective relief. George Nash of Jirdon Agri–Chemical, the retailer that sold the Dyfonate to the Currys, made the first visit. He contacted Julie Ludwigs, a regional Stauffer representative, who came to the Currys' farms and examined the corn crop in late July. Ms. Ludwigs pulled several of the corn plants and found that all of them suffered from severe root pruning caused by western corn rootworms. She then informed the Currys of the advice offered by the main offices of Stauffer, which was to irrigate the fields one more time even though they had been well irrigated previously. The Currys did this, but this effort failed to solve the problem. Later, Ms. Ludwigs returned to the Currys' farms with two other Stauffer representatives, Mr. Buddy Johnson and Dr. Benjamin Kantack. Dr. Kantack, a well-respected entomologist employed by South Dakota State University, suggested, after his inspection, that the Currys' corn suffered from numerous problems but that the most severe was an iron deficiency caused by local soil conditions. Dr. Kantack's opinion developed into Stauffer's primary defense in the trial of this case.

On their own, the Currys submitted samples of the Dyfonate that had been applied to their fields to a chemical laboratory for analysis. That examination demonstrated that this was an unexceptional batch of the product and the samples were well within specifications. No defect could be identified in the product.

Late in August of 1985, two experts provided by the University of Wyoming, Dr. Don Roth, a plant pathologist, and Dr. Chris Burkhardt, an entomologist, went to the Curry farms to observe their problems. Bob Quade, an agronomist, and Larry Scott, a soil expert, also inspected the Currys' corn fields and the affected crop. Dr. Burkhardt's evaluation is summarized in his trial testimony to the effect that "the loss of the roots was due to severe rootworm damage and pruning of the root stems by corn rootworms as a result of the failure of Dyfonate to control the corn root-

worms in those fields." Dr. Roth was in agreement with this view, and he added that the corn plants also manifested symptoms of a severe iron deficiency.

In 1986, following up on his visit, Dr. Burkhardt requested the Currys to plant what is known throughout the farming industry as a "test plot." A test plot is a small section of land intentionally infested with corn rootwarm larvae and organized into different patches of corn treated with various insecticides. An untreated "check group" is always included for comparison. In the test plot prepared by the Currys, Dyfonate was evaluated as well as two other corn rootworm insecticides, Counter and Furadan. The Dyfonate killed rootworms adequately, but it is interesting to note that, in this particular test plot, there was very little difference in actual corn production between heavily infested and non-infested plants. The experts employed by the Currys did not rely upon this test plot information and explained to the jury at trial that, since each test plot is different and numerous unaccounted for variables continuously affect all of them, the information did not seem relevant with respect to what happened in 1985.

Predictably, however, the result of the test plot experiment enhanced Stauffer's contention that the cause of the failure of the 1985 corn crop on the Curry farms was iron deficiency caused by local conditions rather than western corn rootworms. Stauffer adopted the stance that otherwise healthy plants are able to withstand even a heavy infestation of corn rootworms without a significant loss of yield. Stauffer relied upon the results of the 1986 test plot as well as the results from various other test plots in farms other than those owned by the Currys. The Currys' counterposition was that they agreed that an iron deficiency caused the problem, but their perspective was that the iron deficiency was attributable to root pruning by the corn rootworms rather than inherent soil conditions.

In their initial complaint, the Currys sought damages pursuant to theories of negligence, breach of express warranty, breach of implied warranties of both merchantability and fitness for an intended purpose, and alleged willful and wanton misconduct. In an amended complaint which they filed, the Currys extended their damage claim to include not only damages for the loss of the 1985 corn crop, the cost of the insecticide, and the loss of profits from the cattle feeding operation, but they added claims for damages for the loss of their farms, prejudgment interest, and the loss of their farming occupation as well as the future income to be derived therefrom.

Stauffer defended by asserting that the cause of the Currys' crop failure, and related problems, was an intrinsic iron deficiency and not Dyfonate. Stauffer also asserted that it was not subject to liability under warranty claims because of disclaimer language printed on the insecticide packages. In addition, Stauffer contended that, if it were found liable, the Currys' damages would be limited to the purchase price of the product in accordance with a statement of limitation of liability printed on the product packages.

Stauffer filed a motion for a partial summary judgment designed to limit the potential damage award, which was denied. Undeterred, Stauffer filed a second motion requesting the district court to reconsider its denial of the previous motion, but that relief also was denied. Stauffer then filed still another motion for partial summary judgment by which it sought to have the court eliminate all damage claims other than those relating to the difference in the market value of the 1985 corn crop actually obtained by the Currys and its possible value if the expected yield had occurred, plus any lost profits incurred in the custom cattle feeding business proven to be occasioned by the crop losses. The trial court granted this aspect of the summary judgment motion and inhibited the Currys from arguing or presenting evidence with respect to their other damage claims.

Stauffer, at the close of the Curry's case, and again at the close of all the evidence, moved for a directed verdict on all claims and theories. The district court granted that motion with respect to the claim of

willful and wanton misconduct, but permitted the case to go to the jury on the other theories asserted in the pleadings although no instruction was given with respect to negligence. The jury then returned a general verdict for the Currys in the amount of $69,756.00, and the judgment entered by the court was for that amount together with costs of $4,170.74. This appeal followed.

Following the chronology of the case in the trial court, we start with issues relating to the pretrial rulings made by the district court. The first ruling of which Stauffer complains is that the district court erred in concluding that the warranty limitation and limitation of liability language included on the bags for the Dyfonate were ineffective as a matter of law. The district court ruled that the information contained on the bags was not "conspicuous" so as to comport with the requirements of § 34–21–233(b), W.S.1977, and thus was not effective to disclaim implied warranties of merchantability or fitness for a particular purpose.

The Dyfonate that was applied by the Currys to their corn fields was packaged in fifty-pound sacks, each containing the following language printed in separate text and bordered by a heavy red rectangle:

"NOTICE—READ CAREFULLY

"CONDITIONS OF SALE

Stauffer (and seller) offer(s) this product for sale subject to, and buyer and all users are deemed to have accepted, the following conditions of sale and warranty which may only be varied by written agreement of a duly authorized representative of Stauffer.

"WARRANTY LIMITATION

Stauffer warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes referred to in the directions for use on the label subject to the inherent risks referred to below. Stauffer makes no other express warranties: THERE IS. NO IMPLIED WARRANTY OF MERCHANTABILITY and there are no war-ranties which extend beyond the description on the label hereof.

"INHERENT RISKS

The directions for use of this product are believed to be reliable and should be followed carefully. However, it is impossible to eliminate all risks associated with use. Buyer assumes all risks associated with the use or application of this product contrary to label instructions or resulting from extraordinary weather conditions.

"LIMITATION OF LIABILITY

In no case shall Stauffer be liable for special, indirect or consequential damages resulting from the use or handling of this product and no claim of any kind shall be greater in amount than the purchase price of the product in respect of which such damages are claimed."

The basic rules relating to the disclaimer of implied warranties are found in the provisions of the Wyoming Uniform Commercial Code. Section 34–21–233(b) states, in pertinent part:

" * * * [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."

This court has recognized that a correctly. executed and displayed exclusion or modification of an implied warranty is enforceable. *Ogle v. Caterpillar Tractor Company,* 716 P.2d 334 (Wyo.1986); *Western Equipment Company, Inc. v. Sheridan Iron Works, Inc.,* 605 P.2d 806 (Wyo.1980). Disclaimers of the warranty protections are not favored and are strictly interpreted, however, because implied warranties are imposed for reasons of public policy. *B.F. Goodrich Company v. Hammond,* 269 F.2d 501 (10th Cir.1959); *Quality Acceptance Corporation v. Million and Albers, Inc.* 367 F.Supp. 771 (D.Wyo.1973).

In applying § 34–21–233(b), attention must be addressed to two distinct requirements for an effective disclaimer of the implied warranty of merchantability.

The first is that the disclaimer must mention merchantability unequivocally. The second requirement is that the statement, in case of a writing, must be conspicuous. *Quality*, 367 F.Supp. at 773. If the disclaimer is in writing and is conspicuous, there is no requirement that the customer actually read or acknowledge the disclaimer in order for it to become a part of the bargain. *O'Neil v. International Harvester Company*, 575 P.2d 862 (Colo.App.1978). If the disclaimer is conspicuous, it is automatically applicable to the purchase and, even if it is inconspicuous, a disclaimer will become a part of the bargain if it is read or acknowledged by the customer prior to purchase. *O'Neil.* In connection with a disclaimer of the implied warranty of fitness for a particular purpose, the statute establishes two slightly different requirements. In the instance of the implied warranty of fitness, the disclaimer must be in writing and, similar to the requirement for disclaiming the warranty of merchantability, must be conspicuous. The justification for these statutory requirements is to assist the consumer, or purchaser, in avoiding a "fine print" waiver of his rights. *Quality*, 367 F.Supp. at 773; *Greenspun v. American Adhesives, Inc.*, 320 F.Supp. 442 (E.D. Pa.1970). The disclaimer of an implied warranty is an affirmative defense, and the burden of proof is assigned to the seller or manufacturer to demonstrate that the customer knew of the disclaimer in the event that it is found not to be sufficiently conspicuous. *Miller v. Badgley*, 51 Wash.App. 285, 753 P.2d 530 (1988); *DeCoria v. Red's Trailer Mart, Inc.*, 5 Wash.App. 892, 491 P.2d 241 (1971).

Stauffer and the Currys agree that a disclaimer of an implied warranty of fitness for a particular purpose and an implied warranty of merchantability, if in writing, must be conspicuous to be efficacious unless the buyer has read or acknowledged the disclaimer. No dispute is present over the fact that the Stauffer disclaimer on the fifty-pound sacks mentioned merchantability. It did so in bold type so that the words stand out prominently from surrounding words. Consequently, the first requirement pertaining to the implied warranty of merchantability is appropriately met and, because the disclaimer is in writing, that requirement relating to disclaimer of an implied warranty of fitness also is satisfied. The only dispute is whether the disclaimer was conspicuous.

■ In the Wyoming Uniform Commercial Code, the definition of "conspicuous" is encompassed in § 34–21–120(a)(x), W.S. 1977, which provides, in pertinent part:

" 'Conspicuous': a term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. * * * *Whether a term or clause is 'conspicuous' or not is for decision by the court;'* * * *."* (emphasis added).

By this statutory language, the legislature assigned the determination of whether a term or clause is conspicuous to the court. The effect in this case is that the resolution of that issue was a matter for the district court to resolve in the exercise of its discretion, and we will not overturn that ruling absent a demonstration of the abuse of the court's discretion resulting in prejudice.

■ The record in this case discloses that the disclaimer on the Dyfonate sacks was located toward the bottom of the sack and was printed in type approximately one-half the size of the type used to provide other information. If the bag were standing upright, the disclaimer would be very difficult to see. After commenting on these facts, the district court found that the disclaimer on the Dyfonate sacks was not sufficiently conspicuous to comport with the requirements of § 34–21–233(b). This determination is plausible and does not constitute any abuse of the discretion afforded the district court. We affirm the ruling that the warranty disclaimer on these sacks was not effective in accordance with the requirements of the Wyoming Uniform Commercial Code relating to disclaimer of implied warranties. No error

was committed by the inhibition imposed by the trial court upon Stauffer with respect to reliance upon these disclaimers.

As an alternative to reliance upon the disclaimers, Stauffer invokes a claimed limitation of the amount of recoverable damages to the purchase price of the product. A seller, or manufacturer, is permitted to limit the buyer's remedy for a breach of warranty. This is authorized by § 34–21–298(a)(i), (ii), and (c), W.S.1977, in the following language:

"(a) * * *:

"(i) The agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

"(ii) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

 \* \* \* \* \* \*

"(c) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

In relying upon the limitation of liability quoted above, Stauffer's contention is that the limitation of liability differs from the disclaimer of implied warranties in that it is not subject to the requirement that it be conspicuous. The conclusion Stauffer seeks to have the court reach is that, if there is liability, the damages which the Currys may recover are limited solely to the purchase price for the Dyfonate insecticide.

 We agree with Stauffer that this statute does not specifically mention a requirement that the limitation of liability be conspicuous. We are unable to agree with the proposition that the requirement is not applicable. We conclude that the appropriate rule is that a limitation of liability statement, like a disclaimer of an implied warranty, must be conspicuous in order to become a basis for the bargain. Whether the limitation of liability is sufficiently conspicuous is a factual determination again falling within the discretion of the district court.

 Our rules for statutory construction lead us to this result. One of those rules is that an absurd result, whenever apparent, is to be avoided. *Gerstell v. State of Wyoming, ex rel. Department of Revenue and Taxation,* 769 P.2d 389 (Wyo. 1989). We also followed the rule that the legislature is presumed to intend to adopt legislation that is reasonable and logical and does not intend to adopt statutes that are futile. *Gerstell; Phillips v. State,* 760 P.2d 388 (Wyo.1988); *State of Wyoming, ex rel. Department of Revenue and Taxation, Motor Vehicle Division v. McNeese,* 718 P.2d 38 (Wyo.1986); *McGuire v. McGuire,* 608 P.2d 1278 (Wyo.1980); *State of Wyoming, ex rel Department of Revenue and Taxation v. Irvine,* 589 P.2d 1295 (Wyo.1979). The presumption in statutory construction is that the legislature does not intend to adopt statutes that are futile. E.g., *Phillips, Hamlin v. Transcon Lines,* 701 P.2d 1139 (Wyo.1985); *Wetering v. Eisle,* 682 P.2d 1055 (Wyo.1984); *Thomson v. Wyoming Instream Flow Committee,* 651 P.2d 778 (Wyo.1982). We also invoke the concept, as we reiterated it in *Gerstell,* 769 P.2d at 394, that "statutes that relate to the same subject matter should be harmonized wherever that is possible." *WYMO Fuels, Inc. v. Edwards,* 723 P.2d 1230 (Wyo.1986); *State of Wyoming, ex rel. Motor Vehicle Division v. Holtz,* 674 P.2d 732 (Wyo.1983). The application of these rules makes it evident that the legislature, in this instance, intended an implicit requirement that a limitation of liability be conspicuous, similar to that expressed in § 34–21–233(b), be engrafted upon the provisions of § 34–21–298.

Both of these statutes, not just § 34–21–298, are concerned with limitations of liability. Section 34–21–233(b) clearly

and directly permits the modification or restriction of implied warranties of merchantability and fitness for a particular purpose. If the statute is properly followed, the potential is present to foreclose an aggrieved purchaser from any recovery. That, of course, would be the ultimate limitation of liability. The difference then between the application of § 34–21–233(b) to foreclose any recovery and the limitation on liability authorized by § 34–21–298(a)(i), (ii), and (c) is only a matter of degree. Depending upon the choice the seller, or manufacturer, makes with respect to foreclosing and limiting liability, the general effect of these two statutes is substantially identical. In fact, § 34–21–233(b) specifically makes reference to the limitation of damages for contractual modification of remedy authorized in § 34–21–298. Unless the court determined that it was unconscionable or unreasonable, the contract potentially could limit liability to a token sum or nothing.

 Because the protections granted under these two statutes have the potential of achieving substantially the same result, it would be inappropriate for one to be burdened by a requirement that did not apply to the other. For that reason, we consider §§ 34–21–233(b) and 34–21–298(a)(i), (ii), and (c) in pari materia, and we construe them together. See *Gerstell; Phillips.* When viewed from this perspective, it is essential that we recognize an implicit requirement that, in order to be a part of the basis of the bargain, the limitation on liability be as conspicuous for purposes of invoking § 34–21–298 as it is for invoking § 34–21–233. We need not consider, in this case, a demand that the limitation on liability be in writing because Stauffer relies only upon a written limitation. To construe the application of the two statutes as Stauffer urges would create an absurd result contrary to the intention of the legislature. *Gerstell; Phillips.* In our judgment, it would be unreasonable and illogical to reject a disclaimer of an implied warranty under the Uniform Commercial Code because it was not conspicuous and then justify the same result by invoking an inconspicuous limitation of liability.

We turn then to the pretrial ruling that is urged by the Currys in their cross-appeal. This issue arises out of the previously noted grant of a partial summary judgment on damages in response to Stauffer's motion. The effect of that ruling was to limit the Currys' recovery of consequential damages to the difference in the value of the 1985 corn crop, the lost profits from the 1985 custom cattle feeding business attributable to the loss of the 1985 corn crop, and punitive damages. The latter feature was subsequently eliminated by a directed verdict on that claim in favor of Stauffer. The Currys insist that there did exist genuine issues of material fact sufficient to negate summary judgment, but we affirm the decision of the district court in this regard.

 The principles invoked with respect to summary judgment generally are applicable in the case of a partial summary judgment. The fundamental purpose is to eliminate the expense and burden of a formal trial if only questions of law are involved. *Fiscus and Wuestenberg v. Atlantic Richfield Company,* 773 P.2d 158 (Wyo.1989); *Johnson v. Soulis,* 542 P.2d 867 (Wyo.1975); *Vipont Mining Company v. Uranium Research Development Company,* 376 P.2d 868 (Wyo.1962). The applicability of this proposition is somewhat attenuated in this case because the trial was imminent in any event. Even so, the parties and the courts cannot profit by engaging in a protracted development of superfluous factual matters when there is no prospect of recovery. The elimination of an unfounded claim is beneficial even if the entire case cannot be disposed of.

A partial summary judgment, like a summary judgment, can only be accepted if we find there was no genuine issue of material fact and that the prevailing party was entitled to judgment as a matter of law with respect to the adjudicated claim. See *Fiscus.* See also *Matter of Larsen,* 770 P.2d 1089 (Wyo.1989); *Farr v. Link,* 746 P.2d 431 (Wyo.1987); *Duffy v. Brown,* 708 P.2d 433 (Wyo.1985); *Greaser v. Williams,* 703 P.2d 327 (Wyo.1985). Even though the effect upon a party's case is not the same as

a total summary judgment, we still follow the same precepts. The burden of demonstrating that there is no genuine issue of material fact and that the claim properly can be disposed of as a matter of law is on the movant. *Jones Land and Livestock Company v. Federal Land Bank of Omaha*, 733 P.2d 258 (Wyo.1987); *Schutkowski v. Carey*, 725 P.2d 1057 (Wyo.1986). In making this determination, we examine the record from the vantage point of the party opposing the motion and afford to that party the benefit of every favorable inference and any doubt. *Fiscus; Wessel v. Mapco, Inc.*, 752 P.2d 1363 (Wyo.1988); *England v. Simmons*, 728 P.2d 1137 (Wyo. 1986); *Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo.1986); *Roth v. First Security Bank of Rock Springs*, 684 P.2d 93 (Wyo.1984).

■ We recognize, however, that the beneficial purpose of partial summary judgment would be defeated if unnecessary trial time could be forced by a simple assertion that a genuine issue of material fact exists. *Noonan v. Texaco, Inc.*, 713 P.2d 160 (Wyo.1986); *Johnson; Maxted v. Pacific Car & Foundry Company*, 527 P.2d 832 (Wyo.1974); *McCamon v. Darnall Realty*, 444 P.2d 623 (Wyo.1968). For that reason, the opposing party is required to refute the assertions of the moving party if they have been properly set forth and adequately supported. General allegations and conclusive statements do not satisfy this burden. *Jones; Roth.* Solid evidence establishing the factual issue is required. "Categorical assertions of ultimate facts without supporting evidence cannot defeat summary judgment." *Seamster v. Rumph*, 698 P.2d 103, 106 (Wyo.1985). See also *Keller v. Anderson*, 554 P.2d 1253 (Wyo.1976). Any evidence presented to rebut a sound prima facie case that justifies summary judgment must be both tangible and admissible. Rule 56, W.R.C.P.; *Jones; Sanders v. Lidle*, 674 P.2d 1291 (Wyo. 1984); *Gennings v. First National Bank of Thermopolis*, 654 P.2d 154 (Wyo.1982). In making this determination, we look only to the materials available to the trial court. We cannot expand the record by accepting information presented for the first time on appeal. See *Gifford v. Casper Neon Sign Company, Inc.* 618 P.2d 547 (Wyo.1980), appeal after remand 639 P.2d 1385 (Wyo. 1982). If the opposing party does not satisfy his burden, the summary judgment is to be affirmed.

In this instance, Stauffer supported its motion for summary judgment by attaching excerpts and exhibits from the depositions of Charles Curry, Robert Curry, and Ted Bentley, President of the Citizens National Bank and Trust Company, as well as the Currys' responses to various interrogatories submitted to them. These materials demonstrated that much of the Currys' loss was caused by extrinsic factors and not by the failure of the 1985 corn crop. These materials, together with the supporting memoranda, were sufficient to establish a prima facie case for summary judgment against the Currys on the claims of consequential damages.

■ The burden of refuting this case was upon the Currys. The Currys responded, but failed to offer sufficient admissible evidence to contradict the facts found in the Stauffer materials. Robert Curry submitted an affidavit to the effect that the 1985 crop loss caused the Currys to lose their line of credit and this ultimately resulted in the loss of their farming and cattle feeding business. Our scrutiny of his affidavit, however, demonstrates that it is simply an assertion of a conclusion as to an ultimate fact and cannot be relied upon to contest the motion for summary judgment. *Western Surety Company v. Town of Evansville*, 675 P.2d 258 (Wyo.1984). See *Keller*. The other evidentiary materials that the Currys submitted lacked proper foundation and, for that reason, were not competent. See *Jones*. See also *Gennings*. Because the controversion of the prima facie case for summary judgment made by Stauffer was not adequate, we accept the conclusion of the district court that no genuine issue of material fact existed with respect to the eliminated claims for consequential damages, and we affirm the partial summary judgment.

We turn then to those rulings which developed in the course of the trial. The first of those relates to the development of the Currys' theory of express warranty and is, in some respects, similar in consequence to the trial court's elimination of the implied warranties disclaimer on the product bags. In developing their case, the Currys presented a small booklet, prepared by Stauffer, entitled "Corn Protection Manual." The Currys testified that they relied upon representations included in this manual in selecting the insecticide to be used in 1985. Closing argument by counsel encompassed the contention that these representations not only swayed the Currys with respect to their choice of insecticides but formed an express warranty in the contract between the parties that was broken by Stauffer because the Dyfonate did not satisfy these representations. In presenting their case, the Currys offered only the first few pages of the "Corn Protection Manual" into evidence, asserting that any other pages were not relevant because the pages offered were the only ones that contained information about corn and Dyfonate. Because they were only interested in raising corn, the Currys testified they only read these pages.

Stauffer did not object to this offer of evidence by the Currys, but it did argue to the district court that the entire manual, including a disclaimer on the back cover, should be received. That disclaimer was in the following language:

"ALWAYS READ AND FOLLOW THE LABEL!

"Since product use recommendations and precautions are subject to revision, the instructions on the actual container label and any supplemental label should *always* be carefully read and followed. While the information contained in this literature was current at publication, it does not replace the product label.

"NOTICE: Stauffer Chemical Company makes no warranty, express or implied, including the warranties of merchantability and/or fitness for any particular purpose, concerning this material, except those which are contained on Stauffer's label attached to the product container.

All sales are subject to the conditions of the sale stated on the product container or label."

██ The district court rejected the Stauffer contention that the entire manual should be admitted when part of it was offered by the Currys, and it received only those portions offered. In addition, the district court perceived the language on the back cover as serving the same purpose as the disclaimer printed on the product sacks. Therefore, it specifically ruled that the disclaimer language included on the back cover of the "Corn Protection Manual" should not be introduced because, like the disclaimer language on the product sacks, it was not sufficiently conspicuous. Stauffer made no further attempt to introduce the remainder of the manual during either its cross-examination of the Currys or in the presentation of its case in chief. The consequence is that the claimed disclaimer, even though offered and subsequently refused at the termination of a hearing on an offer of proof, was not presented to the jury, and it never was considered during the course of their deliberations. Stauffer contends that it relied upon the back cover of the "Corn Protection Manual" as a disclaimer of express warranty as well as a disclaimer of implied warranty. The statute relating to the disclaimer of an express warranty, differing from the statute relating to the disclaimer of implied warranties, does not require that the disclaimer be conspicuous. Section 34-21-233(a), W.S. 1977, provides:

"(a) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (section 2-202 [§ 34-21-121]) negation or limitation is inoperative to the extent that such construction is unreasonable."

Stauffer urges that there is no requirement that a disclaimer of an express warranty established under the Uniform Commercial Code must be conspicuous. We agree with this position. We can discern no require-

ment, express or implied, that the disclaimer of an express warranty be conspicuous. Decisions from other courts support this view. *Boone Valley Cooperative Processing Association, Eagle Grove, Iowa v. French Oil Mill Machinery Company*, 383 F.Supp. 606 (N.D.Iowa 1974); *Checker Taxi Company, Inc. v. Checker Motor Sales Corporation*, 376 F.Supp. 997 (D.Mass.1974); *Gramling v. Baltz*, 253 Ark. 352, 485 S.W.2d 183 (1972).

In emphasizing its contention, Stauffer argues that "there is an inherent and erroneous hypocrisy in permitting the plaintiffs to go forward on a claim of express warranty based upon the Corn Protection Manual while contemporaneously censoring language from the selfsame document which limited express warranties." The logic in this position is correct and, in our judgment, the disclaimer printed on the back cover of the manual, had it properly been offered in evidence, should have been received and considered by the jury for the purpose of determining whether express warranties apparently created by Stauffer's "Corn Protection Manual" had been disclaimed.

■ Expanding upon this proposition, it is clear that an affirmative act, either by conduct or words, is essential to the creation of an express warranty. See *Garriffa v. Taylor*, 675 P.2d 1284 (Wyo. 1984). An affirmative act is also necessary to effectively negate, or limit, an express warranty. The only restriction upon such acts is the requirement that they be "construed wherever reasonable as consistent with each other" and that such construction not be unreasonable. Section 34–21–233(a). Whether the negation, or limitation, is unreasonable is a question for the finder of fact, in this case the jury. It is not a matter of law solely within the purview of the court. Except for what we regard as a shortfall in the offer of the disclaimer, the jury should have been permitted to examine the entire "Corn Protection Manual," including the disclaimer, in order to evaluate not only the scope and terms of the express warranty but also to decide if the terms and conditions were

consistent with each other and reasonable, and whether any negation was unreasonable.

■ Recognizing the validity of Stauffer's theory, we still are unable to find reversible error in the failure of the trial court to submit to the jury all of the "Corn Protection Manual," instead limiting their consideration of it to those pages offered by the Currys. The fact manifested by the record is that Stauffer never properly offered the entire manual, nor did it properly offer the back page. In the course of presenting their case in chief, the Currys offered the first several pages. At that time, Stauffer urged that the entire manual should be admitted (see Rule 106, W.R.E.) but, even though the district court conducted a bench conference, Stauffer did not articulate its position, and it failed to either object to the admission of the portion actually offered or to offer the remainder of the "Corn Protection Manual." Under those circumstances, unless the first few pages were not admissible, the district court could only admit what was offered and no more. At that juncture, there was no error.

■ Subsequently, a hearing was held, outside the presence of the jury, for the purpose of ascertaining whether the Currys were aware of the disclaimer and liability limitation prior to the purchase of the Dyfonate. At the close of that hearing, Stauffer attempted to offer the disclaimer from the "Corn Protection Manual." The court had determined that the disclaimer was irrelevant, in the context of the matters considered at the hearing, because it had neither been read nor seen by the Currys, and the district court refused to admit it. Although the reasons are technical, we accept the district court's decision. Relevancy normally is a matter for the trial court, and we will not overturn its ruling on the admissibility of evidence in the absence of an abuse of discretion. Rules 401 and 403, W.R.E.; *Banks v. Crowner*, 694 P.2d 101 (Wyo.1985); *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, 664 P.2d 27 (Wyo. 1983). The hearing was conducted for the limited purpose of determining, under an

offer of proof, whether the entire "Corn Protection Manual," including the disclaimer, had been read by the Currys. Uncontroverted testimony was that it had not been read. Under the circumstances, the trial court ruled that the manual was not relevant, at least in the context of the purpose for which the hearing had been conducted. The district court's ruling, under these circumstances, was permissible, and we will not overturn it as an abuse of discretion.

There is no showing on the record that Stauffer then established an adequate justification for the admission of the entire manual. Apparently relying upon its conclusion that the relevancy of the manual was implicitly demonstrated, Stauffer merely offered the manual without furnishing the district court any articulation of the reason that it should be received. Stauffer offered nothing tangible to refute the determination of irrelevancy at that time. It is clear that the disclaimer had no relevancy in establishing the Currys' case in chief. Under these circumstances, the evidence being irrelevant at the time it was offered, the refusal to allow it to go to the jury was not error. Rule 401, W.R.E.

■ While many trial courts are quite liberal in determinations relating to the order of proof and the presentation of evidence, and we are tolerant of the informality of many trial proceedings, adherence to appropriate trial procedure and order of presenting evidence cannot be perceived as error. Experience has demonstrated that trial procedure is an essential aspect of jurisprudence and enhances the probability of an efficient trial and a fair search for a just result. Stauffer elected to offer the "Corn Protection Manual" at a time that was not appropriate according to the correct order of a trial. Section 1–11–205, W.S.1977 (June 1988 Repl.). Since disclaimer is an affirmative defense, the relevance of the last page depended upon its presentation in Stauffer's case in chief. The district court did not err in refusing to admit the manual under those circumstances.

■ Even though an offer of evidence is refused one time and on one basis, that determination does not require that the evidence be foreclosed from admission under other circumstances or at another time. Rule 105, W.R.E. Stauffer, assuming that it laid the proper foundation, could have offered the "Corn Protection Manual" during its case in chief. It then clearly would have been relevant to Stauffer's defense of a disclaimer of the express warranties. A refusal of the trial court to admit the proffered evidence when the party who had the burden of establishing the affirmative defense of disclaimer was presenting its case in chief would have been difficult to sustain. That did not happen, however, and the district court was not required to receive the evidence on its own motion. Because we conclude that the evidence never was properly offered, we must rule that there was no error in the refusal of the district court to receive the evidence.

Stauffer's other claim of trial error relates to the testimony, or limitation of the testimony, of certain expert witnesses. As concisely as we can express it, Stauffer argues that the trial court admitted freely the testimony of the Currys' expert witnesses, limited the cross-examination of those witnesses by counsel for Stauffer in critical respects, and then did not afford to Stauffer the same opportunity to present expert testimony that the Currys had enjoyed. In addition, Stauffer urges that the court improperly refused relevant evidence relative to corn rootworm test plots.

■ There does not appear to be any difference among the parties with respect to rules relating to expert testimony and the admissibility of relevant evidence generally. A party should be allowed an appropriate opportunity to present and develop that evidence relevant to that party's theory of the case. Such evidence certainly can include the offering, direct examination, and cross-examination of expert witnesses, under appropriate circumstances, assuming that the testimony of the experts will properly assist the trier of fact. Rule 702, W.R.E. To qualify a witness as an expert, it must be shown that the witness

has adequate knowledge, whether acquired by formal education or otherwise, and the appropriate experience in any area in which he proposes to state an opinion. *Herman v. Speed King Manufacturing Company,* 675 P.2d 1271 (Wyo.1984). This standard is premised on the proposition that any opinion is irrelevant and, for that reason, ought to be excluded if the witness does not possess sufficient expertise to satisfy the fact finder of the validity of the opinion. Rule 402, W.R.E. The decision as to whether an expert is sufficiently qualified to testify is a matter for the court, not the jury, Rule 104, W.R.E.; *Speed King.* Qualification issues normally are resolved during the foundation examination conducted by the proponent of the witness. In addition, the opposing party usually will be permitted to investigate, or voir dire, the witness as to his expertise prior to his actual testimony. Cf. *Thomas v. Metz,* 714 P.2d 1205 (Wyo. 1986). After hearing from both parties, the court will make its ruling as to whether the witness may testify as an expert.

The opposing party still is permitted further investigation into the expert witness' credentials and qualifications, as well as the basis for the opinion the witness has formed, on cross-examination. *Reese v. Dow Chemical Company,* 728 P.2d 1118 (Wyo.1986); *Chrysler Corporation v. Todorovich,* 580 P.2d 1123 (Wyo. 1978). For that reason, cross-examination of an expert witness, differing from the cross-examination of a lay witness, is not necessarily restricted to matters related on direct examination. *Chrysler,* 580 P.2d at 1133. The evidence elicited on cross-examination, however, will affect only the weight and credibility of the expert testimony. Cf. *Metz.* It rarely results in the withdrawal from evidence of his opinion stated on direct examination. *Colorado Serum Company v. Arp,* 504 P.2d 801 (Wyo.1972). The ultimate determination of the qualification of the witness as an expert, like all other evidentiary rulings, is within the discretion of the trial court. *Speed King,* 675 P.2d at 1278; *Ferris v. Meyers,* 625 P.2d 199 (Wyo.1981); *Elite Cleaners and Tailors, Inc. v. Gentry,* 510 P.2d 784 (Wyo. 1973). After the court has made its ruling

to permit or not permit the expert testimony, we overturn that determination only in extreme cases clearly indicating an abuse of discretion resulting in prejudicial error. *Metz; Speed King; Reed v. Hunter,* 663 P.2d 513 (Wyo.1983); *Ferris; McDaniel v. State,* 632 P.2d 534 (Wyo.1981). Furthermore, the jury still makes the ultimate decision as to the credibility of the witness and the weight to be afforded to the expert testimony.

Of course, the inquiry with respect to the admissibility of expert testimony does not end with the qualification of the witness as an expert. Of more significant import, regardless of the degree of expertise, is the universal requirement that the proffered opinion testimony be relevant. Testimony which is not relevant is inadmissible without regard to whether it is to be furnished by an expert witness or by a lay witness. Rule 402, W.R.E. Relevancy determinations, not unlike the determinations as to the qualifications of the expert, are within the discretion of the trial court and, as with the determination of expertise, will not be disturbed absent an abuse of that discretion. Rules 401, 403, W.R.E.; *Banks,* 694 P.2d 101; *Hursh,* 664 P.2d 27.

With these legal precepts before us, we consider the record with respect to expert testimony. Dr. Roth gave his opinion that corn rootworm pruning in the Currys' corn acreage caused the iron deficiencies that he observed and, ultimately, caused the Currys' crop losses. At the time of cross-examination, Stauffer was foreclosed from questioning Dr. Roth about the results of the 1986 test plot or about the results of other test plots that had been planted in Goshen County. When Dr. Burkhardt, George Nash, Larry Scott, and Bob Quade testified as experts called by the Currys, they explained the chlorotic appearance of the corn by informing the jury that the corn plants could not absorb sufficient nutrients to maintain their health without an adequate root system. They ascribed the inadequacy of the root systems on these corn plants to corn rootworm pruning and attributed the degree of that to the ineffec-

tiveness of the Dyfonate. Consistently, Stauffer was denied the right to cross-examine about the test plots. The basis for these rulings was that the test plots were not sufficiently reliable, nor comparable to the Currys' fields, to justify the relevancy of conclusions reached from those test plots. The same justifications were invoked in denying Stauffer's expert from South Dakota University, Dr. Kantack, and the entomologist and plant physiologist, Buddy Johnson, the opportunity to use, as a basis for their opinions, the results of the 1986 test plot or other test plots on various farms in Goshen County. Another of the Stauffer experts, Dr. Ron Gelderman, was not permitted to explain completely his experiences and experiments relating to iron deficient corn because Dr. Gelderman had not personally observed the Currys' farms.

■ We turn first to Stauffer's claim that the district court erroneously restricted the development of its theory of the case. This is a threshold concern because a litigant usually is entitled to a remand and a new trial if it was unfairly prejudiced in the presentation of its case. In presenting this contention, Stauffer asserts that the Currys' "marginally qualified experts" were allowed to testify freely and at length with respect to their opinions, but that the more able and better qualified experts offered by Stauffer as witnesses were severely curtailed in attempting to present information on the same subjects or on other subjects pertaining to the various corn rootworm test plots. Stauffer contends that the district court favored the opposition and rode its experts with a "tight rein."

Specifically, Stauffer asserts that Dr. Roth was only marginally qualified to testify because he was not an entomologist and was, therefore, unacquainted with insects; he had not studied corn rootworms; he had never run a test plot for corn rootworms; and he had never studied the effects of corn rootworm feeding on corn plants. Yet, Stauffer contends that, despite these deficiencies in education and experience, Dr. Roth was allowed to testify freely on all these subjects. Stauffer argues that

Dr. Roth never had studied iron deficiencies in corn and that he never had seen interveinal chlorosis, the particular malady affecting the Currys' crops. Stauffer then insists that its own witnesses, all of whom it perceives as possessing greater knowledge and experience than Dr. Roth, were, for no reason other than their knowledge and a bias on the part of the district court, unduly restricted as they attempted to present an alternate theory for the loss of the Currys' corn crop. Particularly, Stauffer complains that its witnesses were prevented from testifying about their experiences regarding corn reactions to corn rootworm feeding in any geographical area other than the Currys' fields even though that testimony would have been helpful to the jury and would certainly have supported Stauffer's position. The experts that Stauffer contends were erroneously restricted in their testimony were Dr. Kantack, Buddy Johnson, and Dr. Gelderman.

Stauffer also asserts error in the district court's ruling on the Currys' objection to Stauffer's attempt during cross-examination to elicit information from Dr. Roth pertaining to his lack of knowledge of the 1986 test plot and the impact such knowledge might have had on his opinion. The Currys' objection was sustained on the ground that the facts of the matter were neither observed by the witness, heard by the witness through testimony of others, nor presented to him in advance of trial. Stauffer contends that its line of questioning was permissible and should have been allowed. It did submit an offer of proof to show that Dr. Roth, if permitted to answer its questions, might modify his opinions and conclude that the corn rootworm pruning had not caused the stunting and striping he had observed. In its brief, Stauffer contends that, in the eyes of the district court, Dr. Roth's "ignorance" served as "his shield."

Meeting these arguments, the Currys assert that Dr. Roth was well qualified and highly experienced in dealing with chlorotic corn and corn rootworm problems. They attack Dr. Kantack's credibility with an argument that he did not practice in plant

pathology even though he possessed a minor degree in the discipline.

When testifying on direct examination, Dr. Roth established his credentials as an expert by explaining what his profession was and what it entailed, what his educational background was, and what his responsibilities were. He was an extension plant pathologist with the University of Wyoming assigned the primary duty of heading the plant disease clinic in which he was to diagnose various plant health problems occurring with any and all types of plants growing in Wyoming. He possessed a bachelor's degree in plant science, a master's degree in plant protection, and a doctorate in plant pathology. Prior to the testimony as to his opinion, Stauffer was permitted to voir dire Dr. Roth as to both his credentials and his expertise. Stauffer elicited the fact that he was not an entomologist and, furthermore, that his studies did not typically cause him to study corn rootworms. It was also developed, however, that he had experienced corn rootworm problems prior to examining the Currys' fields and also had previous experience with chlorotic corn even though he had never personally grown a corn rootworm test plot.

In presenting its case, Stauffer elicited testimony from Dr. Kantack, its expert, that he was an extension entomologist from the South Dakota State University with a bachelor's degree in agronomy, a master's degree in entomology, and a doctorate in entomology with a minor in plant pathology. He had been with the United States Department of Agriculture for three years, the University of Rhode Island for one year, on Molokai for another year, and then had worked for four years with the University of Nebraska. The record discloses that Dr. Kantack had served in his position with the South Dakota State University for almost twenty-five years. One of his primary responsibilities was to predict insect problems that the farmers and ranchers in South Dakota might encounter. Buddy Johnson, employed by Stauffer, and Dr. Gelderman, also of South Dakota State University, provided similarly impressive credentials.

We conclude that the rulings of the district court with respect to the qualifications of the various experts do not demonstrate any clear abuse of discretion. All are highly qualified in their respective disciplines. Despite contentions to the contrary, Dr. Roth clearly possesses adequate background and experience to testify as an expert in the areas in which he was questioned. The fact that he might be less qualified than others purporting to testify is not a matter of concern under our rules and, indeed, was not an issue with respect to the trial court's determination. Its function, in this context, is to examine the credentials of the proffered witness by a standard of whether adequate expertise to provide meaningful guidance to the fact finder is present. It does not serve as an arbiter in connection with the comparison of qualifications nor need it determine whose experts are "most qualified." That is a function that the jury exercises in measuring credibility and weighing testimony. The experts who testified in this case were qualified appropriately to offer their opinions on the subjects permitted by the district court. Because no clear abuse of discretion has been demonstrated by Stauffer, who must assume that burden, we cannot overturn the ruling of the district court with respect to the qualifications of the experts. *Speed King,* 675 P.2d 1271; *Reed,* 663 P.2d 513; *McDaniel,* 632 P.2d 534; *Ferris,* 625 P.2d 199; *Colorado Serum,* 504 P.2d 801.

Like the rulings with respect to the qualifications of experts, we find no error in the denial by the district court of certain testimony offered by Stauffer. Again, the rule is that the admissibility of evidence rests within the exercise of discretion by the trial court. Rule 104, W.R.E., *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276 (Wyo.1983). Cf. *Hall v. Hall,* 708 P.2d 416 (Wyo.1985) (to cut off evidence arbitrarily is an abuse of discretion). The rulings of trial courts on these matters are given considerable deference and will not be reversed as long as some legitimate basis for the ruling is found. *City of Ev-*

*anston v. Whirl Inn, Inc.*, 647 P.2d 1378 (Wyo.1982). The burden is assigned to Stauffer on appeal to demonstrate an abuse of discretion with respect to the refusal to admit evidence that it offered. *Sims v. General Motors Corp.*, 751 P.2d 357 (Wyo.1988).

For these purposes, we apply our definition of an abuse of discretion as "an error of law committed by the court under the circumstances." *Sims*, 751 P.2d at 362; *Wright v. State*, 707 P.2d 153, 155 (Wyo. 1985). We also invoke our definition of an abuse of discretion as a situation in which "a court acts in a manner which exceeds the bounds of reason under the circumstances." *Smith v. State*, 773 P.2d 139, 144 (Wyo.1989); *Wright*, 707 P.2d at 155.

The district court, in this instance, concluded that evidence of farming practices and experiences remote from the Currys' farms was not relevant to the dispute before it. Relevancy is a matter for the trial court to decide, Rules 401, 403, W.R.E.; *Banks*, 694 P.2d 101; *Hursh*, 664 P.2d 27, and we cannot hold that a proper exercise of this duty is an "error of law committed * * * under the circumstances." *Sims*, 751 P.2d at 362; *Wright*, 707 P.2d at 155. We also find, from the record, that Stauffer did not offer an adequate foundation to demonstrate the relevancy of this proffered testimony at trial. Under these circumstances, we are unable to say that the district court acted in a manner exceeding the bounds of reason. *Smith.* Stauffer has not demonstrated a clear abuse of discretion with respect to the rulings of the trial court rejecting its proffered evidence, and we defer to the district court, holding that its finding as to relevancy provides a legitimate and reasonable basis for its ruling. No error was committed in its refusal of the testimony that Stauffer desired to offer through its experts. Rule 402, W.R.E.

In the context of this part of its argument, Stauffer also contends that it was unduly restricted in its cross-examination of Dr. Roth. While a party does have the right at trial to cross-examine a witness about matters that were the subject of his direct examination, we also recognize that control over the manner and extent of cross-examination, like other evidentiary rulings, falls within the discretionary parameters assigned to the trial court. *Amin v. State*, 695 P.2d 1021 (Wyo.1985); *Donahue*, 674 P.2d 1276; *Nimmo v. State*, 603 P.2d 386 (Wyo.1979). The discretion afforded the trial court is quite broad, and it can permit or refuse to permit cross-examination as it deems proper, even to the extent of excluding relevant testimony "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Rule 403, W.R.E.; *Sims*, 751 P.2d at 362. The district court found that Dr. Roth had no knowledge with respect to certain matters about which Stauffer desired to cross-examine him. Stauffer contends that those matters were relevant and material with respect to its case. We cannot say, however, that further inquiry into these matters could not have been misleading to the jury, a waste of time, or confusing. For that reason, we do not find a clear abuse of discretion on the part of the district court. This identical rationale, with its same conclusion, applies to the alleged restriction of Stauffer's cross-examination of the Currys' other witnesses by the district court, as well as to limitations imposed upon the testimony of Stauffer's expert witnesses.

The next issue to be resolved is Stauffer's claim of error arising out of the failure of the district court to grant its motions for a directed verdict. Stauffer moved for a directed verdict, at the close of the Currys' case in chief and again at the close of all the evidence, asserting that the warranties were appropriately restricted and that the recoverable damages were limited because of the disclaimers discussed above. In its motion, Stauffer also relied on an alleged erroneous application of the implied warranty of fitness for an intended use and on the proposition that the entire issue of liability necessarily had to fail because no specific defect was found in the Dyfonate. Cogent argument was

presented to the district court in support of these motions, and Stauffer, on appeal, offers additional argument to much the same effect. The response of the Currys mirrors positions asserted in the trial court.

The standard that has been adopted for purposes of ruling on a motion for a directed verdict is to inquire whether the evidence is so compelling that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, only one conclusion could be reached by a reasonable man. *Belle Fourche Pipeline Company v. Elmore Livestock Company*, 669 P.2d 505 (Wyo.1983); *Carey v. Jackson*, 603 P.2d 868 (Wyo.1979); *Barnes v. Fernandez*, 526 P.2d 983 (Wyo.1974). All the available evidence must be considered in the light most favorable to the party opposing the motion, and that party is entitled to the benefit of every favorable inference. *Donahue; Carey; Barnes; Potts v. Brown*, 452 P.2d 975 (Wyo.1969). If the inferences favorable to the movant are subject to doubt, or if parallel inferences can be drawn, the motion appropriately is denied. *Ramirez v. Metropolitan Life Insurance Company*, 580 P.2d 1136 (Wyo. 1978).

We also have recognized that, even though a directed verdict is a procedural device designed to save time and expense of trial, the injudicious granting of a motion for directed verdict often results in a greater burden than continuing the trial to its conclusion. *Belle Fourche*. For this reason, directed verdicts are to be cautiously and sparingly awarded. *Vassos v. Roussalis*, 658 P.2d 1284 (Wyo.1983). The concept was articulated with clarity in *Carey v. Jackson*, 603 P.2d at 876:

" 'Even at the close of all the evidence it may be desirable to refrain from directing a verdict though it would be possible to do so. If a verdict is directed and the appellate court holds that the evidence was in fact sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is greatly expedited. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the trial court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial. For this reason the appellate courts have repeatedly said that it is usually desirable to take a verdict, and then pass on the sufficiency of the evidence on a post-verdict motion.' (Footnote omitted.) 9 Wright & Miller, Federal Practice and Procedure, Civil § 2533, p. 586."

We note that the district court faithfully followed this proposed procedure to avoid an unnecessary retrial, and we acclaim its wise invocation of its discretion.

 Pursuing the case in the light of the standards to be applied, we conclude that those standards were not met in this case. When we afford the benefit of every favorable inference to the Currys, it is clearly possible that parallel inferences can be drawn from the evidence or that reasonable persons well could reach conclusions other than those propounded by Stauffer. The jury did just exactly that. Much of the pertinent evidence was through the conflicting testimony of expert witnesses. It is not possible to conclude that the evidence was compelling with respect to Stauffer's position without evaluating the credibility of the expert witnesses and then weighing their testimony. *Carey; Barnes*. Without question, the credibility of all witnesses, including expert witnesses, must be determined by the trier-of-fact. *Donahue*. We hold that the district court properly denied Stauffer's motion for a directed verdict. We also note, in passing, that the presentation of a motion for a judgment notwithstanding the verdict pursuant to Rule 50(b), W.R.C.P., while not essential to the exercise of appellate jurisdiction by this court, serves as an appropriate first step for contesting an unfavorable verdict and denial of the motion for the directed verdict. In

most instances, it would be best to afford the trial court that opportunity to reevaluate its rulings.

 The final trial concern to be addressed is Stauffer's claim that the district court improperly instructed the jury. The first contention with respect to the instructions is that the court should not have advised the jury that liability could be found based on express and implied warranties since such warranties were disclaimed by the language printed on the product sacks and on the last page of the "Corn Protection Manual." Because of the evidentiary rulings which have been discussed previously, the evidence could not support Stauffer's position on this question and, in the light of the evidence, the protested instructions were proper. We are foreclosed from affording Stauffer relief on the additional claims premised on the identical issue without further justification.

 In its next attack on the instructions, Stauffer contends that the jury should not have been instructed on the implied warranty of fitness for a particular purpose since the control of corn rootworms is the "ordinary use" of the product. See *Weir v. Federal Insurance Company*, 811 F.2d 1387 (10th Cir.1987). Part of the reason that the Currys selected Dyfonate over other insecticides, however, was their belief that it would filter down through the surface "trash" created by the minimum till method of preparing the soil. Stauffer, indeed, made representations to this effect in its "Corn Protection Manual." We conclude that this use was specific enough to justify claims of an implied warranty of fitness for a particular purpose, and the representations set forth in the manual constitute sufficient indication of reliance to satisfy the provisions of § 34–21–232, W.S.1977, which states:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

This statutory language controls the facts presented in the record, and there was no error in the submission of instructions to the jury pertaining to the implied warranty of fitness.

 In its last attack on the instructions, Stauffer urges error in permitting the jury to return a general verdict. It cites several persuasive cases, and correctly emphasizes that when multiple theories of liability are submitted to a jury, a judgment entered on a general verdict in favor of the plaintiff must be reversed if the evidence is not adequate to support the verdict on one or more of the multiple theories. *Bendorf v. Volkswagenwerk Aktiengeselischaft*, 88 N.M. 355, 540 P.2d 835 (1975); *Trout v. Umatilla County School District*, 77 Or.App. 95, 712 P.2d 814 (1985), review denied 300 Or. 704, 716 P.2d 758 (1986); *Mina v. Boise Cascade Corporation*, 37 Wash.App. 445, 681 P.2d 880 (1984). Cf. *Cloman v. State*, 574 P.2d 410 (Wyo.1978). No relief is available to Stauffer on this claim of error because we conclude that the evidence was sufficient to permit the jury to find for the plaintiff on any of the theories that were submitted to it. The only theory of liability included in the pleadings that has not been fully discussed previously is the theory of negligence, and the record demonstrates that the jury was not instructed on negligence. A finding for the plaintiffs is plausible under all of the other theories. In addition, we note that Stauffer neither offered a special verdict form nor did it make a timely objection to the use of the general verdict. Under our precedent, this would justify a conclusion that the matter has been waived for purposes of appeal. *Duffy v. Brown*, 708 P.2d 433 (Wyo.1985); *Goggins v. Harwood*, 704 P.2d 1282 (Wyo.1985).

 As a final issue, we address Stauffer's contention that the district court erred by taxing costs in the amounts that were assessed for certain witness and deposition expenses incurred by the Currys. The specific contention with respect to these costs

is that the district court should not have awarded expert witness fees at the rate of $200 per day instead of the statutorily determined nominal fee of $25 per day. Section 1–14–102(b), W.S.1977. In addition, Stauffer contends that deposition costs for photocopies and mileage are not proper costs because there is no authority in this state either by statute, rule, or precedent that justifies the recovery of such expenses. No dispute is presented as to the other costs awarded by the district court. Section 1–14–102(b) provides with respect to fees for expert witnesses:

> "In any civil or criminal case, any party may call expert witnesses to testify and if the court finds any witness to be a qualified expert and the expert gives expert testimony which is admitted as evidence in the case, the expert witness shall be allowed expert witness fees of twenty-five dollars ($25.00) per day or *such other amount as the court allows according to the circumstances of the case.* Expert witness fees may be charged as costs against any party or be apportioned among some or all parties in the discretion of the court." (emphasis added).

Under this statute, the district court is vested with discretion to award "such other amount as the court allows according to the circumstances of the case." In treating similar claims in prior cases, we have established some limits on the discretion of the trial court. Stauffer calls attention to *Buttrey Food Stores Division v. Coulson,* 620 P.2d 549 (Wyo.1980), and emphasizes the limits by urging that the necessity and reasonableness of amounts above the statutory $25 are to be clearly demonstrated by the party seeking reimbursement and that an award made without such a showing will be deemed an abuse of discretion. See *Kaess v. State,* 748 P.2d 698 (Wyo.1987); *Weaver v. Mitchell,* 715 P.2d 1361 (Wyo. 1986); *Duffy; State v. Dieringer,* 708 P.2d 1 (Wyo.1985); *Buttrey; Roberts Construction Company v. Vondriska,* 547 P.2d 1171 (Wyo.1976).

In this instance, the district court, adopting Stauffer's theory in recognition of our precedent, addressed a letter to both parties stating that expert witness fees can exceed $25 per day for each day the witness testifies, but that it is incumbent upon the proponent to show the necessity and reasonableness of any additional award. In the same letter, the district court informed the parties that it would award deposition expenses necessary and proper for the conduct of the trial. After receiving the letter, the Currys submitted affidavits addressing their claim of reasonable costs for their expert witnesses. The district court found that the charges and expenses were reasonable and necessary according to the "circumstances of the case" and, in a subsequent letter, it approved those costs in accordance with the Currys' statement. As is true of other issues assigned to the discretion of the district court, we will not overturn its ruling in the absence of an abuse of discretion. In this instance, there is a greater impetus to defer to the district court because of the statutory mandate requiring the award to be tied to the circumstances of the case. In an instance such as this, the trial judge has a better opportunity to determine the circumstances of the case, or whether an expenditure was necessary and proper, than do we. *Dieringer,* 708 P.2d at 12. The district court reviewed the Currys' affidavits, determined that $200 per day reimbursement was reasonable and necessary for the expert witnesses considering the actual costs incidental to attendance before the court, and awarded those amounts as costs. Nothing contained in the record justifies a redetermination of that award. The district court also concluded that the deposition expenses claimed were proper. We perceive this to be an appropriate exercise of its discretion for the same reasons, and we do not overturn that award. The district court is affirmed with respect to the assessment of costs.

In view of our decision concerning warranty disclaimers and limitations, we have no need to address the argument of the Currys that counsel for Stauffer waived those contentions in stating in closing argument that Stauffer did not rely on the disclaimers and limitations. We simply ob-

serve that Stauffer was confronted by a dilemma since its evidence of disclaimer and limitation had been foreclosed. Given these circumstances, invoking waiver would be a true "catch 22" for Stauffer, and waiver would not be appropriately applied.

We have been able to find no reversible error in this case and, on the basis of the discussion of the several issues, we hold that the judgment of the district court is affirmed in all respects.