Donald HERMAN and Sibble Herman, husband and wife, Appellants (Plaintiffs),

v.

SPEED KING MANUFACTURING COMPANY, a Kansas corporation, G & G Manufacturing Company, a Nebraska corporation, Appellees (Defendants).

No. 83–66.

Supreme Court of Wyoming.

Jan. 13, 1984.

Robert P. Chaloupka (argued) of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, Scottsbluff, Neb.; and Sue Davidson of Urbigkit & Whitehead, P.C., Cheyenne, for appellants.

Glenn A. Hottenstein (argued), of Guy, Williams, White & Argeris, Cheyenne, for appellee Speed King Mfg. Co.

G.G. Greenlee (argued), of Murane & Bostwick, Casper, for appellee G & G Mfg. Co.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

CARDINE, Justice.

This is an appeal from the judgment in an action seeking damages for a personal injury arising out of a farm accident allegedly caused when a PTO shaft malfunctioned. The case was tried without a jury. The court held that the appellants' negligence was equal to or greater than any fault on the part of the appellees and, therefore, entered judgment denying recovery.

We will affirm.

Appellants raise three issues:

"1. Did the Court err in failing to grant Appellants' request for a jury made at the time of the filing of their Amended Petition?

"2. Were the Findings of Fact, and the Judgment entered by [the] Court, so unsupported and against the great weight of the evidence that they should not stand?

"3. Did the trial court commit reversible error in refusing to admit certain portions of Appellants' evidence, and in admitting certain portions of Appellees['] evidence over timely objections by Appellants?"

Appellant, Donald Herman, was severely injured in a farm accident involving a power take off (herein referred to as PTO) driven Speed King Auger. The PTO shaft was manufactured by appellee, G & G Manufacturing, and made part of a grain auger manufactured by appellee, Speed King Manufacturing Co. This particular PTO shaft was protected by a plastic safety shield.

On the day of the accident, appellant Herman arrived at Dr. Cross' ranch to deliver a load of alfalfa pellets. He was driving a large, double axle truck and pulling a pup trailer. Both were full of the pellets. He used a Speed King Auger owned by Dr. Cross to unload the pellets into a granary located at the farm. The truck and trailer were equipped with traps which could be opened in order to allow the pellets to drain into an area from which they could be augered into the granary.

At the time of the accident, the auger was protected by a plastic shield. It was not equipped with an implement master shield, which is a component of the auger rather than the PTO shaft. The implement master shield would protect against entanglements in the unshielded portion of the PTO universal joint where it connects to the auger. The plastic shield protects the auger itself.

While appellant was unloading the feed, he leaned across the rotating PTO shaft to open a trap door in the bottom of a trailer. From this point on, it is not clear what happened. The appellant testified that as he grabbed the grain trap release lever, he felt his chest inadvertently contact the safety shield of the PTO shaft. He remembers nothing from that point. Dr. Cross testified that he saw the PTO shaft suddenly "scoop" Mr. Herman up and begin to beat him about the grain trailer. However, he also testified that the accident happened so quickly that he could not really say that he saw anything in regard to the shaft. Appellants' expert witness testified that in his opinion the PTO shaft destructed because of a process known as "resonance phenomena." He defines this cause as:

"Resonance phenomena simply means that a system, dynamic system, vibrates at a frequency or is being rotated at a frequency where the system would start to resonate such as music strings do and unless they're of adequate strength or dampening, this leads to failure."

Speed King contended that it was impossible to know what caused the accident. However, they contend that the more probable cause was that the shaft had been deformed in a prior incident, that the safety shields had been removed before this accident, and therefore, when the plaintiff leaned over the unguarded shaft, he was picked up and thrown against the trailer. They contend that the shaft assembly was not defective. Appellee G & G Manufacturing proposed the argument that the accident was caused when Mr. Herman's right sleeve became entangled in the

unguarded universal joint thereby pulling his body into the shaft.

█ The burden is on the appellants to establish by a preponderance of the evidence the facts necessary to a prima facie case. The trial court judge found that the PTO shaft was not defective when it left the possession of G & G, that it was not altered nor modified by Speed King, that it was not defective when finally affixed to the Speed King grain auger, and appellants did not meet their burden of proof.

## I

### RIGHT TO JURY TRIAL

Appellants did not request a jury at the time of filing their original complaint. The trial judge recognized this omission and advised counsel by letter, fifteen months later, that, since no jury demand had been asserted, trial would be to the court. Appellants then presented a motion for leave to amend their complaint, which included a demand for a trial by jury. The judge allowed the amended complaint to be filed. However, he ruled that trial would be to the court because the jury demand was not timely. Appellants assert that the amended complaint contained new material, issues, and claims which of right are triable by jury. They contend that new and additional facts, developed throughout the period of discovery, were the basis for alternate additional claims under the theories of negligence, strict liability, breach of warranty, and for punitive damages.

Rule 38(b)(1), W.R.C.P., states:

"Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after service of the last pleading directed to such issue. Such demand may be endorsed upon a pleading of the party."

Appellants would have us construe this rule as permitting a demand for a jury within ten days after *any* pleading which addresses the issue. Appellants assert that their amended complaint falls within this classification. However, we have consistently stated that:

"' '' * * * Demand may be made within ten days after service of the amended or supplemental pleading for new issues raised by that pleading but the amendment does not revive a right, previously waived, to demand jury trial on the issues already framed by the original pleadings. Nor does the late demand create a right to jury trial on issues raised by the amended or supplemental pleadings if those issues were fairly raised by the original pleadings."' '" *Cates v. Daniels*, Wyo., 628 P.2d 862, 865 (1981), quoting from *Scherling v. Kilgore*, Wyo., 599 P.2d 1352, 1356 (1979).

█ Amendments to the pleadings which do not change the issues do not revive a right to a jury trial. 5 Moore, Federal Practice § 38.41 (2nd ed. 1948); *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.*, 440 F.2d 765 (2nd Cir. 1971); Wright & Miller, Federal Practice and Procedure Civil § 2320.

█ However, if fundamental factual questions or new issues are stated in the amendment, a jury trial can be granted as to those new issues. The complaint, as originally filed in this case, set forth claims for relief based upon theories of negligence, breach of warranty, and strict liability. The amended complaint sets forth the same claims and contains also a claim for punitive damages. However, there were no new facts, nor any facts at all, which would justify a claim for punitive damages. Therefore, the allegations are similar, and the case upon the amended complaint was based on the same theories. We perceive no difference.

If Rule 38(b)(1) is not complied with, Rule 38(d), W.R.C.P., comes into effect and states in part:

"The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. * * *"

There being no new facts nor issues contained in the amended complaint, the right to a jury trial was waived by not being timely filed. There was no error in the denial of a trial by jury.

## II

## WAS THE JUDGMENT SUPPORTED BY THE EVIDENCE?

■ On appeal, this court assumes that the evidence in favor of the successful party is true, leaving out of consideration entirely the evidence presented by the unsuccessful party. We will not substitute our judgment for that of the trial court unless that judgment is clearly erroneous and contrary to the great weight of the evidence. *City of Rock Springs v. Police Protection Ass'n*, Wyo., 610 P.2d 975 (1980); *Barnette v. Doyle*, Wyo., 622 P.2d 1349 (1981).

Appellants contend that ten of the fourteen findings of fact and two conclusions of law are not supported by the evidence in whole or in part. They are as follows:

"3. * * * The PTO shaft also was sold with a universal-joint shield, not in use at the time of the accident. * * *

"4. * * * The only eyewitness to the accident, Dr. Robert Cross, was vague in his memory of some circumstances surrounding the accident. His position at the time of the accident would have made it difficult for him to accurately observe the exact circumstances of the accident. There was little apparent damage to the plastic shield or tubing and steel PTO bar either as the result of the accident or as the result of the method used in straightening the PTO shaft after the accident.

"5. If the PTO shaft had been bent to an angle of 60 degrees there would have been significant damage to the plastic shield and the metal tubing.

\*  \*  \*  \*  \*  \*

"8. The Court finds that the Defendant, Speed King, purchased 1100 identical shafts from G & G. Other than the instant case there have been no complaints or reports of failure or self destruction. * * *

"9. Speed King in 1972 made certain tests of the PTO shaft. * * * The tests did not produce a distortion of the PTO shaft in the same manner as alleged to have occured [sic] in this case.

"10. The testing conducted by G & G did not result in failure of the PTO until the shaft was operated at an extension far beyond that recommended by the manufacturer and then did not produce the same distortion as here alleged.

"11. In reviewing the evidence there are numerous explanations for the accident occurring which were not considered by the experts in arriving at their conclusions, for example: over extension or disattachment of the shaft from the auger or the tractor.

"12. That this particular PTO shaft with auger had been in use a number of years and had been operated while over extended, had been dropped and dragged by a pickup during transportation, and had other wise [sic] been poorly maintained.

"13. Steel pins are original equipment used to attach the PTO shaft and auger assembly. At some period in time the pins had been replaced with nails.

"14. That the plaintiff had worked around PTO shafts and grain augers for a number of years and was aware of the inherent danger of this type of machinery but disregarded the danger in reaching over the PTO shaft to open the trap door beneath the trailer.

### Conclusions of Law

\*  \*  \*  \*  \*  \*

"5. The design of the PTO shaft is utilized by the PTO and auger industry throughout the country. There is no evidence before the court of a safer design * * *.

\*  \*  \*  \*  \*  \*

"7. That the plaintiff's conduct was negligent, a misuse of the product and an assumption of risk, which fault was

equal to or greater than any fault on the part of the defendants. * * * "

■ The first finding of fact which appellants contend is not supported by the evidence is that the auger was sold with the master universal joint shield. The parties are not in dispute that the master universal joint shield was not in use at the time of the accident. However, appellants contend that the shield was not sold with the auger. There was evidence presented that the 1971 owner's manual showed the shield; that Speed King had engineering drawings of the shield; and that the packing list used by Speed King to pack the parts for shipment listed the shield. These items were in use prior to the purchase of the auger by Dr. Cross. Speed King's president testified that the master shield would have been packed with the packing box of parts for Speed King's auger not later· than April 1971. Dr. Cross bought the auger in 1973. Applying our standard of review to these facts, there was sufficient evidence from which the district court judge could find that the auger was sold with a master universal joint shield.

Appellants next argue that the finding of fact concerning the testimony of the eyewitness was not supported by the evidence. Appellants state that Dr. Cross was not vague in remembering the circumstances surrounding the accident and that his only problem in testifying was recalling how he separated the PTO shaft after the accident. Dr. Cross testified that he was underneath the truck, positioning a tire when the accident happened. He stated that he saw Don Herman's arm reach up to pull on the compartment and

"* * * all of a sudden things started happening and I saw him fly in the air. I saw his feet in the air and I could look up and I saw the auger jump out of the top of the granary and I knew the shaft bent. I didn't have to see it bend. * * "

On cross-examination, portions of Dr. Cross' deposition were read in which he was asked,

"Before the accident happened, just before it happened, could you see him?"

Dr. Cross answered,

"I could, yes. It's just from memory. I'm not positive though."

When asked if he remembered seeing any part of Don Herman as opposed to all of him, he answered,

"Well, I can remember seeing—after the accident his feet were in the air and I quickly rushed around to the back of the truck * * *."

When asked if he could see the entire body or just the feet, his answer was,

"Well, I think I could see most of him, but I'm not positive. You know, I'm just assuming that I saw him. It's been so long ago."

■ Part of Dr. Cross' testimony states "Q. (By Mr. Greenlee) Isn't it true, Mr. —Dr. Cross, that you never saw Mr. Herman put any weight on the shaft? "A. I assumed he did, but I didn't see him put weight on it. "Q. And it's true, isn't it, that you weren't expecting anything to happen, so you weren't observing very well; isn't that so? "A. That's right."

Viewing the evidence in a light most favorable to appellees, the trial judge could reasonably find that Dr. Cross' testimony concerning the accident was vague.

■ Appellants next contend that the trial judge could not have found the PTO shaft had been bent to an angle of 60 degrees. The evidence verifies the fact that the shaft was bent at an angle of approximately 120 degrees. Visual exhibits, drawings, and pictures were all presented showing the angle to be 120 degrees. It seems logical to conclude that the trial judge, in finding the angle of 60 degrees, was referring to the deformation of 60 degrees, the angle resulting from a comparison of the original position and the bent position. There was a great deal of testimony and visual exhibits concerning the angle. We conclude from a review of the record that, from the conflicting evi-

dence, the trial judge could interpret that evidence and conclude as he did regarding the extent to which the shaft had bent.

■ We do not feel it would be productive to go through each of the findings of fact which appellants contend are not supported by the evidence. The record is voluminous; there is considerable testimony by many witnesses, much of which was conflicting. The trial court was in a position to observe the witnesses, their demeanor on the stand, and to hear and weigh their testimony. The evidence was conflicting and often confusing. *Krist v. Aetna Casualty & Surety,* Wyo., 667 P.2d 665 (1983). The court, if the case is tried without a jury, has:

" * * * the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from facts established, resolving conflicts in evidence, and reaching ultimate conclusions of fact. * * * " (Emphasis omitted.) *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.,* 571 F.2d 1144, 1149 (10th Cir.1978), cert. denied 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171.

■ Appellant was injured in an accident occurring while he was using a grain auger. However, this accident was not proven to be the result of any negligence or breach of duty by either appellee which was greater than the negligence of appellants. Although it is not clear exactly how the accident occurred, it is clear that the trial judge was not convinced of the theory propounded by appellants. After reading the record, we are persuaded that the court's analysis of the situation was in accord with the weight of the evidence. Considering the complicated nature of this case, the court did an admirable job. It was the trier of facts with the duty of weighing evidence, resolving conflicts, and making findings. There was evidence in every instance to support the court's findings; and, applying our standard for review, these findings will not be disturbed on appeal.

■ Again we stress that a reviewing court does not provide an opportunity to attorneys to retry their cases. We do not redetermine conflicts in evidence.

## III

### ADMISSION OF EVIDENCE

■ Appellants argue that their expert was not allowed to testify as to the standard of a reasonable and prudent manufacturer. However, the record indicates that appellants were allowed considerable leeway in putting on testimony to this effect. Thus, appellants' expert testified:

"Q. Do you have an opinion as to whether a reasonable and prudent manufacturer of PTO shafts should test in the design of those products for vibration?

"A. Yes.

"Q. What is that?

"A. It's my opinion that they should."

When appellees objected to the expert's answer that he had an opinion as to whether or not G & G acted as a reasonable and prudent manufacturer in 1971 or 1972, the objection was sustained because the court said:

" * * * I think he has answered the question, if not the exact wording of that question, certainly he has gone over that same territory at least two or three times."

Appellants' attorney answered:

"I certainly accept that. I just am trying to make sure that what I consider to be an essential element of the case has been covered and if your notes reflect that his opinion is that G and G did not meet that standard, then that is good enough for me."

Appellants were able to present this and other expert testimony in support of their case; it is simply that the trial judge did not find it to be sufficiently compelling when weighed against the other evidence.

Appellants also argue that their expert should have been allowed to testify with regard to the design of plastic shields. Rule 702, W.R.E., states:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Foundation has been laid for the opinion of the expert when the qualification of the witness with respect to his knowledge or special experience is sufficiently established. This is a matter resting within the discretion of the trial court. We will not disturb that determination except in extreme cases. *Elite Cleaners and Tailors, Inc. v. Gentry*, Wyo., 510 P.2d 784 (1973); *Taylor v. McDonald*, Wyo., 409 P.2d 762 (1966).

Appellants' expert witness testified:

"Q. It's true, Mr. Sevart, that you do not consider yourself an expert in plastics; is that correct?

"A. That's correct.

\*     \*     \*     \*     \*     \*

"Q. (By Mr. Greenlee) You never worked in the PTO industry as such, have you?

"A. I have never been employed by a company manufacturing PTO's; that's right.

"Q. And you have never consulted to a PTO manufacturer as an engineer.

"A. To a company that manufactures them?

"Q. Yes, sir.

"A. Only in the sense that that was part of—that the PTO was part of the equipment. I have had several clients over the years who have PTO shafts, but it's part of their equipment.

"Q. Your consulting had nothing to do with the PTO portion of the equipment.

"A. As far as any extension, that would be true."

The trial judge determined that sufficient foundation had not been laid to permit the witness to testify concerning the state of art in this industry, particularly in regard to plastic shields. Although the framers intended liberal application of the Rules of Evidence in considering receipt of opinion evidence, we cannot say that in this instance the exclusionary ruling was incorrect as a matter of law. There will be times when the witness is not qualified and the opinion should not be received. Appellants' expert had been allowed to testify exhaustively on many subjects relating to appellants' theory of the case. But in the last analysis, a witness must be qualified as an expert with regard to each area in which he offers testimony—here he was not. The trial court found he was an expert but not in this particular field.

Finally, Rule 7.04, W.R.A.P., states:

"Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

Appellants have the burden of establishing that any error is prejudicial and, therefore, warrants reversal. *Spilman v. State*, Wyo., 633 P.2d 183 (1981). In civil cases, we have said that

" \* \* \* for an error to be harmful, there must be a reasonable possibility that in the absence of error the verdict might have been more favorable [to the losing party]. \* \* \* " *ABC Builders, Inc. v. Phillips*, Wyo., 632 P.2d 925, 935 (1981). Here the court received most of the expert's testimony, but excluded some of it. Appellants claim error in the court's rulings so as to require reversal in this case.

It is not often that a ruling upon evidence of this kind constitutes reversible error. It is a small part of the total trial. In this case the trial to the court was lengthy and complicated. There was a vast amount of expert testimony adduced. Exclusion of the testimony complained of could hardly have affected the outcome. We can find no prejudice of the kind required nor has such prejudice been demonstrated by appellants.

We will not address the second part of this issue, i.e., that the trial court erred in admitting certain portions of appellees' evidence over timely objections by appellants,

because no cogent argument was presented. *Holding's Little America v. Bd. of Cty. Comm'rs of Laramie Cty.*, Wyo., 670 P.2d 699 (1983).

The general principle is that where there is sufficient competent evidence to sustain a finding in a case tried by the court without a jury, admission or exclusion of incompetent evidence is not a ground for reversal. *Arnold v. Jennings*, 75 Wyo. 463, 296 P.2d 989 (1956). This case lasted a considerable amount of time; the record contained over fifteen hundred pages of testimony. After having read the transcript thoroughly, we conclude that there was substantial evidence to support the findings of the trial judge; that there was not error in the evidentiary rulings of the court; and that jury trial was waived by appellees' failure to timely file a jury demand. The judgment, therefor, is

Affirmed.