2004 WY 72

**Gavin DONNELLY, Appellant(Plaintiff),**

v.

**Connie DONNELLY, Appellee (Defendant).**

No. 03–177.

Supreme Court of Wyoming.

June 24, 2004.

Representing Appellant: Devon O'Connell Coleman and Eric R. Boyer of Pence and MacMillan LLC, Laramie, Wyoming.

Representing Appellee: Patrick M. Hunter of Casper, Wyoming.

Representing Guardian Ad Litem: John M. Burman, Faculty Supervisor; and Deborah L. Tyser, Student Intern, UW Legal Services, Laramie, Wyoming.

Before HILL, C.J., and GOLDEN, and LEHMAN, JJ., and JAMES, D.J., and SKAVDAHL, D.J.

HILL, Chief Justice.

[¶ 1] Appellant, Gavin Donnelly (Father), seeks review of the district court's decree of divorce that awarded primary custody of the parties' children to Appellee, Connie Donnelly (Mother). The district court appointed a guardian ad litem (GAL) to represent the best interests of the parties' children in these proceedings.

[¶ 2] Father contends that the district court erred in denying his motion for new trial, which was premised upon the basis that confidential statements he made during mediation were communicated to the parties and were made known to the judge during the trial to the court. He also asserts that the district court abused its discretion when it granted primary custody to Mother based solely upon gender and contrary to the weight of the evidence. In addition, Father

challenges the district court's failure to include in its decision letter a ruling from the bench that he would be entitled to visitation with the children for not less than forty percent of their time. Mother asserts that the district court's rulings were entirely proper and that Father's appeal is without merit thus entitling her to an award of costs, attorney's fees, and a penalty. We will affirm and decline to award Mother a penalty or attorney's fees under W.R.A.P. 10.05.

## ISSUES

[¶ 3] Father raises these issues:

I. Was it clearly erroneous for the district court to deny [Father's] motion for a mistrial due to the egregious release of confidential statements made during mediation; did the district court's denial result in manifest injustice to [Father]?

II. Did the district court abuse its discretion when it granted primary residential custody to [Mother] based solely on gender and contrary to the evidence?

III. Was it an abuse of discretion for the district court to rule from the bench that the non-custodial parent would not get less than forty percent of the time with the children, then rule to the contrary in its decision letter and subsequently deny [Father's] motion for amendment of judgment?

Mother couches the issues in these terms:

1. Did the district court properly deny [Father's] motion for a mistrial, when it is clear that nothing regarding any activity or communications between the mediator and [Father] affected or influenced the district court's decision.

2. Is it an abuse of discretion for the district court, in part, to base a custody decision on the gender based parenting roles the parties had adopted throughout the marriage, thereby minimizing the stress adjustment for the minor children.

3. Did the district court rule from the bench on the appropriate amount of visitation.

4. Is there no reasonable cause for appeal, for which the Supreme Court may award attorney's fees to [Mother].

The GAL filed a brief with this statement of the issues:

I. Did the district court act within its discretion in denying [Father's] motion for a mistrial?

II. Did the district court act within its discretion when it granted primary residential custody to [Mother]?

III. Did the district court rule only once and therefore properly deny [Father's] motion to amend the judgment?

## FACTS AND PROCEEDINGS

[¶ 4] Father's complaint seeking a divorce was filed on July 19, 2002. Two children were born of the marriage, a girl born on April 14, 1997, and a boy born September 19, 1999. On October 24, 2002, a guardian ad litem (GAL) was appointed to represent the children, and the district court provided detailed guidance to the GAL.[1] By order entered on October 29, 2002, the district court awarded temporary residential custody to Mother during the school/work week (Sunday afternoon through Thursday), and to Father (Thursday evening through Sunday). The district court's final decree made that arrangement permanent.

[¶ 5] All matters with respect to the divorce were settled, with the exception of custody of the children. Both Mother and Father sought to have residential (primary) custody of the children during the work/school week, with the other having as much visitation as possible. Each parent considered the other to be a very good parent, and the record amply demonstrates that both were good parents.

[¶ 6] On July 17, 2002, Mother abruptly left the marriage and the family home in Laramie, without notice to Father. Mother moved to Casper to be near her sister and eventually set up a home there for herself and the children. A few days later, she accepted that Father wanted to take the children back to Laramie for a visit. When

---

1. The district court's explicit instructions to and the thorough performance of the GAL were superlative in this case. *See Pace v. Pace*, 2001 WY 43, ¶¶ 21–26, 22 P.3d 861, ¶¶ 21–26 (Wyo.2001).

Mother went to Laramie to pick up the children and return with them to Casper, she and Father got into a heated quarrel about the children that both regretted. Father reluctantly allowed Mother to take the children back to Casper.

[¶ 7] Mother contended that she should be awarded residential (primary) custody on a permanent basis because she had traditionally been the "stay-at-home mom," who provided the children with day-to-day care, and she was able to fulfill that role in Casper even though she worked five days a week. Father contended that he should be awarded primary custody because Laramie had been the children's home all of their lives. In addition, Father had a more stable life and a more flexible work schedule. Because of those factors, he could spend more time at home with the children during the week (i.e., there would be less day care, which had always been a goal of both parents). Mother lived in a two-bedroom apartment, without an adjoining yard (although it did have a communal yard with a playground and other child-friendly amenities), whereas Father owned the family's spacious home that had its own yard. Father lived across the street from a school the children could attend, whereas in Casper the children were placed in a school that required them to ride a bus 40 miles per day. We decline to set out Father's exhaustive critique of Mother, or Mother's more abbreviated critique of Father. The district court's decision letter made clear that the evidence established that both were fit and proper parents to have custody of the children. It is clear that the district court viewed their respective shortcomings as the ordinary frailties of all human beings, choosing instead to focus on the many positive qualities of both parents, and then making the daunting and challenging task of "dividing" the children between their parents.

[¶ 8] After a two-day trial, the district court settled the custody issues making permanent the custody resolution detailed in the temporary custody order. That order was entered on July 15, 2003.

## DISCUSSION

### Denial of Motion for Mistrial

[¶ 9] Before trial on the issue of custody, the parties engaged in voluntary mediation in an attempt to settle their dispute. Eventually, that mediation attempt ended without bearing fruit. During a pretrial conference the district court indicated that what transpired during settlement negotiations would not be admissible at trial. Nonetheless, during the trial to the court, Mother's attorney asked Father questions about his communications with the mediator and some of those questions were answered. The answers tended to cast Father in an unfavorable light. The mediator conveyed that information to Mother's attorney, as well as to the GAL. It is not necessary to set out the details or the tenor of those revelations, because to do so would only exacerbate a problem that this appeal is designed to resolve. Father contends that he was so prejudiced by those revelations that the district court was duty bound to grant his motion for a mistrial, so that the case could be tried before a judge not tainted by that information.

[¶ 10] Although pertinent authority does not support the contention that a new trial is mandated by these circumstances, the argument is premised on some interesting threads of argument. In *VJL v. RED*, 2002 WY 25, ¶ 16 n. 3, 39 P.3d 1110, ¶ 16 n. 3 (Wyo.2002), we noted:

> We make no ruling as to the propriety of the mediator's report. We note only that the function of a mediator is to be a conciliator, to bring parties together in an effort to reconcile their differences. Interjecting oneself into court proceedings after the fact of the mediation as basically a witness to discredit the truthfulness and character of a party to the mediation would not seem to comport with the functions of a mediator.

Of course, the mediator was not a witness in this case, though it is clear that confidential information was communicated outside the confines of that mediation to Mother's attorney and the GAL, and eventually to the trial court.

[¶ 11]   Wyoming's mediation statute provides this guidance:

### § 1–43–101.   Definitions.

(a) As used in this act:

(i) "Communication" means any item of information disclosed during the mediation process through files, reports, interviews, discussions, memoranda, case summaries, notes, work products of the mediator, or any other item of information disclosed during the mediation, whether oral or written;

. . . .

### § 1–43–102.   General rule of confidentiality.

Any communication is confidential if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the mediation process or those reasonably necessary for the transmission of the communication.

### § 1–43–103.   General rule of privilege; claiming privilege; exception.

(a) A party to the mediation has a privilege to refuse to disclose and to prevent all mediation participants from disclosing confidential communications.

(b) The privilege under this section may be claimed by a representative of the party or by a party, his guardian or conservator, the personal representative of a deceased party, or the successor, trustee or similar representative of a corporation, association, or other organization, whether or not in existence.   The person who was the mediator may claim the privilege but only on behalf of the party.   The mediator's authority to do so is presumed in the absence of evidence to the contrary.

(c) There is no privilege under this section if any one (1) of the following conditions is met:

(i) All the parties involved provide written consent to disclose;

(ii) The communication involves the contemplation of a future crime or harmful act;

(iii) The communication indicates that a minor child has been or is the suspected victim of child abuse as defined by local statute;

(iv) The communication was otherwise discoverable prior to the mediation;

(v) One of the parties seeks judicial enforcement of the mediated agreement.

■   [¶ 12]   The district court determined that it would not consider any of that evidence and, thus, the issues of confidentiality and privilege were not analyzed in detail by the trial court.[2]   The motion for mistrial could have been styled as a motion for new trial as well, and its posture as a motion for mistrial is unusual, given that this was a trial to the court.   On appeal from a trial to the court sitting without a jury, we presume that the district court disregarded any improperly admitted evidence unless the record affirmatively demonstrates that the court's decision was influenced by that evidence.   *Carlton v. Carlton,* 997 P.2d 1028, 1033 (Wyo.2000); *Hillard v. Marshall,* 888 P.2d 1255, 1261 (Wyo.1995).

[¶ 13]   In *Feeney v. State,* 714 P.2d 1229, 1230 (Wyo.1986) we held:

On appeal it is presumed, in cases tried by a court without a jury, that the court in reaching its decision disregarded improperly admitted evidence unless the record affirmatively shows that the trial court's decision was influenced by improperly admitted evidence.   *X v. Y,* Wyo., 482 P.2d 688 (1971).

The reason behind the rule is amply explained in *Yount v. Strickland,* 17 Wyo. 526, 101 P. 942, 944 (1909), which held that, since a trial judge can "sift the wheat from the chaff," in a case tried by a court without a jury, the admission of incompetent evidence is not presumed to be prejudicial.   *Cooley v. Frank,* 68 Wyo. 436, 235 P.2d 446

---

**2.**   Although Mother and the GAL argue that the disputed evidence/information was admissible and was not confidential or privileged as contemplated by the governing statutes, we find it unnecessary to definitively address that issue.   Moreover, this matter was not sufficiently developed by the parties below so as to allow for a definitive resolution.   Clearly the better practice would have been for all parties and the mediator to fully comply with the mediation statutes and for any issues in that regard to be settled before the subject became a target of questioning.

(1951); *Russell v. Curran,* 66 Wyo. 173, 206 P.2d 1159 (1949); *Williams v. Yocum,* 37 Wyo. 432, 263 P. 607 (1928). [Footnote 1 omitted.]

This is the general rule as also expressed in 5 C.J.S. Appeal and Error § 1564(5), and 5A C.J.S. Appeal and Error § 1728.

Thus, the rule presumes that the judge will disregard the inadmissible evidence in making a decision. In this case, the trial judge even acknowledged on the record that the evidence that appellant refused to take a field sobriety test would be disregarded when making a decision. There is sufficient evidence in the record absent the evidence that Feeney refused the test for proper conviction of driving while under the influence, and therefore no error was committed. *Herman v. Speed King Manufacturing Company,* [Wyo., 675 P.2d 1271 (1984)] *supra.*[2]

---

[2] We will not pursue the academic inquiry as to what occurs (or what it means) if the court in a nonjury trial should declare a mistrial for his improper admission of evidence.

*Also see Holt v. Sarver,* 442 F.2d 304, 307 (8th Cir.1971) ("In nonjury cases tried to the court it is well settled that we will not reverse for the erroneous reception of evidence unless it appears that the competent evidence is insufficient to support the judgment or that the court was induced by incompetent evidence to make an essential finding which it would not otherwise have made.").

[¶ 14] This discussion from 21 Charles Alan Wright & Kenneth W. Graham, Federal Practice and Procedure: Evidence § 5041, at 227–29 (1977) is also instructive:

This model will need to be somewhat modified in cases tried without a jury. Most of the required modifications follow from the absence of that separation of function between trier of fact and judge of admissibility. Since it is impossible for the judge to rule on most objections without seeing the evidence—and a good deal of other material not strictly relevant to the case—many objections become futile as a practical matter. Moreover, the presumed sophistication of the judge is thought to permit him to do much of the work of weeding out weak evidence at the time of decision rather than at the point of introduction of the evidence. This leads to a prejudice in favor of admissibility and an informal manner of handling objections summed up in the ominous ruling: "I'll let it in for what it is worth"

It is important to note that the principal prop for this attitude toward the rules in court trials is a presumption on appeal that the judge did not consider any inadmissible evidence in reaching his decision. Nowhere is there any explicit authorization to disregard the rules in nonjury cases. Indeed, one can argue that the failure to limit the scope of the Evidence Rules to jury trials, as suggested by many commentators, constitutes an explicit rejection of the notion that the rules do not apply in trials without a jury. In a sense, then, the power of the judge to disregard the rules of evidence is like the power of the jury to disregard the substantive law; both flow from a failure to sanction the departure from the rules rather than a clear grant of power to ignore them. While it is true that departing from the rules of evidence is not as serious a matter as nullification of the substantive law, still it should be recognized that in each case the failure to prevent the departure is the result of an expectation that the de facto power thus conferred will be exercised in a responsible manner.

A responsible exercise of the court's ability to depart from the Rules in nonjury cases certainly entails more than just sloughing off objections with the hackneyed promise that it will only be considered for what it is worth. The judge should consider the nature of the objection; it is appropriate to slide by the technical requirements of the best evidence rule but few would argue that the judge was justified in ignoring a claim of privilege. If the objection involves probative worth, the judge might convert the admission-exclusion process into a consideration of what weight he should give the evidence. Often the same factors that govern admissibility will be relevant in this inquiry. If the evidence involves evidence that might prej-

udice a juror, the judge ought not lightly assume that he is immune from its emotional impact. In some cases it may be appropriate to have the question of admissibility decided by another judge or by a master.

The judge must also keep in mind that the offer of proof in a nonjury case serves an additional purpose; it should not only show whether the exclusion of evidence is harmless, but also "provide the appellate court with material for a possible final disposition of the case in the event of reversal." This argues for the greater use of the question-and-answer form of offer of proof in nonjury cases. This makes quite attractive the procedure for admission and exclusion suggested by McCormack. He proposes that the trial judge admit virtually all of the evidence, reserving questions of admissibility until the close of proof-taking. Then should the judge decide to strike the evidence, it remains in the record as an offer of proof for the reviewing court. This procedure probably produces better rulings since the parties can prepare their arguments with greater care and in light of the entire record. It may save time since the parties may decide to abandon the less significant objections and the argument on admissibility can be combined with arguments on how the evidence should be evaluated on the merits. The principal disadvantage of this method is the tendency to produce gargantuan records.

[¶ 15] In this instance, the district court gave careful and thorough consideration to Father's motion for a mistrial in its decision letter.[3] At the conclusion of that discussion, the district court forthrightly stated:

The mediation the parties entered into was not court ordered. The Court appreciates the parties in fact made one more attempt to settle this matter before resorting to the adversarial process of litigation. The record indicates [Father] *may* have had a conversation with the mediator shortly before this trial. In that conversation he *may* have fired ... the mediator. Ultimately the mediation was unsuccessful and the matters are now before the Court. Whether the conversation occurred before or after [Father] technically fired the mediator is irrelevant. [Father] had the ability to terminate the services of the mediator. [Father] has every right to maintain the confidentiality of those proceedings. Whatever behavior [Father] *may* or *may not* have engaged in during that conversation is also irrelevant. The fact of the matter is that ultimately the mediation was unsuccessful and the issues of custody, support, and visitation are now before the Court. Any evidence admitted relating to this conversation, or evidence relating to any part of negotiations of settlement for that matter, have absolutely no impact on decisions made pertaining to these issues.

. . . .

At no point during the trial were specific references to any settlement negotiations ever allowed into evidence. The Court remains unaware of any settlement or offers which may have been tossed around during negotiations. No evidence was placed before the Court regarding statements made during compromise negotiations. The Court has not and will not consider allegations regarding the conduct of either party during negotiations or mediation, and will discuss custody, visitation, and related matters strictly on the evidence received at trial pertaining to these parties' ability to parent in accord with what is in the *best interests* of these children. This was not a trial to a jury but was in fact a trial to this Court. No evidence was presented which would necessitate a mistrial. On the other hand, granting a mistrial would constitute grave and extreme prejudice to the children. [Emphasis in original.]

[¶ 16] The record is also clear that the GAL's recommendations were limited to the evidence adduced at trial and focused on the statutory factors that bear on a determina-

---

**3.** Father also contends that the district court erred in not granting a request for a hearing on the mistrial motion. We readily conclude that whether to hold a hearing is a matter of discretion, and that discretion was not abused under these circumstances.

tion of what is in the best interests of the children. There is no suggestion that the GAL's recommendations were colored by confidential information or that the district court was otherwise influenced by improper information. The initial written report of the GAL's recommendations is not a part of the record.[4] Father asks that we speculate that the report was favorable to him, whereas the GAL's closing argument recommended that Mother have primary custody, and was thus unfavorable to him. Father then asks that we speculate further and conclude that the reason the GAL recommended as he did was because of the confidential information communicated to him by the mediator. We decline to so speculate. The GAL's closing argument, as well as his position in this appeal, are grounded in the evidence adduced at trial and focus solely upon the statutory factors pertinent to child custody determinations. Moreover, the GAL's closing argument was a product of seeing and hearing all witnesses who testified and with access to all documentary evidence admitted at trial. The GAL's argument to the district court is consistent with that evidence and supported by that evidence.

[¶ 17] Based upon our careful and thorough review of the record, we conclude that the district court did not err, or in any way abuse its discretion, in denying the motion for mistrial under the circumstances of this case. In addition, considering these circumstances in their totality we do not find the presence of a manifest injustice. *Robbins v. Robbins,* 2002 WY 80, ¶¶ 7–9, 46 P.3d 880, 882–83, ¶¶ 7–9; *Moore v. Moore,* 809 P.2d 261, 264 (Wyo.1991).

**Gender as Basis for District Court's Ruling**

[¶ 18] The governing statute is clear without equivocation in this regard:

§ 20–2–201. **Disposition and maintenance of children in decree or order; access to records.**

(a) In granting a divorce, separation or annulment of a marriage or upon the establishment of paternity pursuant to W.S. 14–2–401 through 14–2–907, the court may make by decree or order any disposition of the children that appears most expedient and in the best interests of the children. In determining the best interests of the child, the court shall consider, but is not limited to, the following factors:

(i) The quality of the relationship each child has with each parent;

(ii) The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;

(iii) The relative competency and fitness of each parent;

(iv) Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

(v) How the parents and each child can best maintain and strengthen a relationship with each other;

(vi) How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii) The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;

(viii) Geographic distance between the parents' residences;

(ix) The current physical and mental ability of each parent to care for each child;

(x) Any other factors the court deems necessary and relevant.

(b) **In any proceeding in which the custody of a child is at issue the court**

---

4. The initial report was appended to Father's pretrial memorandum. However, ultimately that report was not included in the record. That initial report was prepared prior to trial and before the GAL had the opportunity to hear all of the admissible evidence and observe the testimony of all witnesses.

**shall not prefer one (1) parent as a custodian solely because of gender.**

(c) The court shall consider evidence of spousal abuse or child abuse as being contrary to the best interest of the children. If the court finds that family violence has occurred, the court shall make arrangements for visitation that best protects the children and the abused spouse from further harm.

(d) The court shall order custody in well defined terms to promote understanding and compliance by the parties. Custody shall be crafted to promote the best interests of the children, and may include any combination of joint, shared or sole custody.

(e) Unless otherwise ordered by the court, the noncustodial parent shall have the same right of access as the parent awarded custody to any records relating to the child of the parties, including school records, activities, teachers and teachers' conferences as well as medical and dental treatment providers and mental health records.

(f) At any time the court may require parents to attend appropriate parenting classes, including but not limited to, parenting classes to lessen the effects of divorce on children. [Emphasis added.]

[¶ 19] Custody matters are committed to the sound discretion of the trial court. The welfare and needs of the children are to be given paramount importance. We will not overturn the decision of the trial court unless we are convinced that it constitutes an abuse of discretion or violates some legal principle. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria. It means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Our review includes an evaluation of the evidence to support the trial court's decision, and we afford the prevailing party every favorable inference while omitting any consideration of evidence presented by the unsuccessful party. We cannot sustain findings of fact that are not supported by the evidence, contrary to the evidence, or

against the great weight of the evidence. An abuse of discretion is present when a material factor deserving significant weight is ignored. Consideration of gender is not prohibited in a custody determination. The governing statute simply prohibits gender from being the "sole" basis of a custody award. Every case requires careful weighing of relevant factors, looking to the unique and individual family relationships, in order to reach a resolution that is in the best interests of the children. To determine whether a district court has abused its discretion, we must rely upon the district court's articulation of the factors that were considered and how those factors support its conclusions. *Pace v. Pace*, 2001 WY 43, ¶¶ 9–13, 22 P.3d 861, ¶¶ 9–13 (Wyo.2001). We have held that a gender based, maternal preference in custody awards is a mistake of law, requiring reversal. *Basolo v. Basolo*, 907 P.2d 348, 355 (Wyo.1995).

[¶ 20] Father's contentions in this regard are founded in the district court's description of the roles played by the two parents during their marriage. Mother, was a "stay at home mom" who "bathed, dressed, and fed the children. She maintained the home, prepared the meals and did all other housework. She read to the children, helped them with basic educational skills, took them to the park, and provided transportation to their extracurricular activities." Father was a very engaged parent and helped Mother with most of the child rearing tasks. He "more naturally fit into a traditional fatherhood role. He worked forty (40) plus hours a week. He traveled to attend seminars, training sessions, and worked on special projects toward enhancing his experience and career, with [Mother] staying at home with the kids." The difficult decision that the district court confronted is captured in this excerpt from its decision letter:

Perhaps one of the most difficult decisions is the determination of custody and visitation when both parents display qualities of propriety and fitness that these parties demonstrate. This is not a situation where one parent "wins" and the other parent "loses." To the contrary, they remain the parents of [the children], and

they are obligated to act in their best interests at all times. Regardless of the outcome, [the children] will "win" if their parents determine to make this Court's decision work and if they set aside their own differences in favor of the children. [The children] will "lose" if their parents do otherwise. Neither is this a matter where the Court is called upon to determine that one parent is "better" than the other. Both parties love their children. Nevertheless, the Court must make a determination as to custody and visitation.

The evidence indicated that [Mother] has served as [the children's] primary caretaker since their births. This is not, of course, determinative, but it is a consideration that the Court bears in mind. [The children] have good relationships with both parents, and both parents care deeply for them. Both presently are capable of caring for [the children], and both are willing and eager to accept that responsibility. When the children are with their father, the evidence demonstrated a positive, rewarding experience for both father and children. Likewise, the kids do equally well with their mother. Any unusual behavior exhibited by either child after a transfer from one party to the other is probably in the nature of a temporary, situational issue rather than any sort of long-term fundamental problem. [The children] are both intelligent, happy children who seem to be adjusting to their parents' separation.

The parties agree that if they were to reside in the same city, now or in the future, a shared or joint custody arrangement would be possible. Obviously, since [Father] is in Laramie and [Mother] is in Casper, this is an infeasible solution. Therefore, each party has asserted the desire for primary custody with liberal and frequent visitation available to the other. Both parents have excellent relationships with their children. Both parents are fit and competent to provide adequate care, physically, emotionally, mentally, culturally, spiritually, and educationally, to these children. [Mother] cannot be "faulted" for geographically relocating to Casper, while [Father] cannot be "faulted" for staying in

Laramie or opting not to move to Casper upon retirement. Both parties have indicated they plan to stay in their current locations. Both [Father] and [Mother] have exhibited good moral behavior and positive lifestyles crucial to the healthy upbringing of these children. [Father] had friends, family and day-care providers attest on his behalf. [Mother] likewise had family and child care providers testify as to her fitness as a person and a mother.

However, when considering the totality of the situation and the overall best interests for these children, the Court finds the children need stability which mimics the traditional parenting roles these parents have held in [the children's] lives rather than focusing on the physical location of the parties. [Mother] has been the "need" provider, [Father] has been the "wants" provider. Each has and can perform the other's role. However, the Court finds the best interests of these children would best be served by [Mother] continuing to be the primary caretaker during the week, while permitting [Father] the ability to continue offering all of the enhancements and opportunities for growth and happiness to the children which he has done in the past. While the Court is cognizant that each parent would prefer more *time* with their children than any separation will allow, the children's *time* is now best served in a fashion similar to that which the children are accustomed. [Emphasis in original.]

While [Father] has argued that his home in Laramie would better suit such a situation, the Court disagrees. Marce Nesslinger, a licensed counselor, met with the children at the request of [Father]. Ms. Nesslinger testified either parent could adequately be the primary caretaker, so long as the children had a "home-base" for purpose of stability. She stated the physical building was not what comprised the "home base," but rather where the children felt comfortable, safe and nurtured and able to foster their relationships with both parents. The evidence indicated [Mother's] residence adequately furnishes the physical needs for the children. [The children] are well situated, aside from typi-

cal adjustments needed after visitations and travel occur. The children have become comfortable residing in Casper due in large part to [Mother's] diligence. The GAL, likewise, recommends such an arrangement.

[¶ 21] The district court's decision letter is ten pages long. We are unable to discern in it a decision based solely on gender. Indeed, while to some extent described in gender-specific nouns, the district court is very clear that the roles he discusses are not peculiar to one sex or the other; rather, it is strictly a matter of function. The decision reached by the district court is not a violation of § 20–2–201(b). The district court relied upon objective criteria in reaching its decision and did not act arbitrarily or capriciously. We have carefully reviewed the evidence in its entirety and, when we view that evidence in a light most favorable to Mother, we are compelled to sustain the district court's decision. The district court's findings are fully supported by the evidence, and the district court neither considered an impermissible factor, nor did it fail to consider any factor material to a resolution of this case.

## Denial of Motion to Amend the Judgment (the Forty Percent Issue)

[¶ 22] Near the close of the trial, the district court made a fleeting reference to Wyo. Stat. Ann. § 20–2–304(c) (LexisNexis 2003). That statute provides:

(c) When each parent keeps the children overnight for more than forty percent (40%) of the year and both parents contribute substantially to the expenses of the children in addition to the payment of child support, a joint presumptive support obligation shall be determined by use of the tables. After the joint presumptive child support obligation is derived from column three of the tables, that amount shall be divided between the parents in proportion to the net income of each. The proportionate share of the total obligation of each parent shall then be multiplied by the percentage of time the children spend with the other parent to determine the theoretical support obligation owed to the other parent. The parent owing the greater

amount of child support shall pay the difference between the two (2) amounts as the net child support obligation.

Based upon that fleeting reference, Father contends that the district court made a binding oral ruling that Father was entitled to visitation for at least 40% of the children's time. Continuing, Father contends that because the final decree does not allow him 40% of the children's time, the district court is duty bound to amend its judgment to conform to that oral pronouncement. Of course, the record is not clear what percentage of the time Father has spent, or will spend, with the children over the course of time. The decree is clear that Father's time with the children is to be as generous as possible, and Mother has pledged to make that happen to the extent it is feasible, consistent with circumstances. In addition to being illogical, this argument is not supported by cogent argument or pertinent authority, and we will not consider it further. *Odegard v. Odegard,* 2003 WY 67, ¶ 31, 69 P.3d 917, ¶ 31 (Wyo.2003).

## Is this Appeal without Merit

[¶ 23] W.R.A.P. 10.05 provides:

If the judgment or appealable order is affirmed in a civil case, appellee shall recover the cost for publication of the brief with the cost to be computed at the rate allowed by law for making the transcript of the evidence. If the court certifies there was no reasonable cause for the appeal, a reasonable amount for attorneys' fees and damages to the appellee shall be fixed by the appellate court and taxed as part of the costs in the case. The amount for attorneys' fees shall not be less than one hundred dollars ($100.00) nor more than five thousand dollars ($5,000.00). The amount for damages to the appellee shall not exceed two thousand dollars ($2,000.00).

[¶ 24] Sanctions under this rule are generally not available when the appeal challenges a discretionary ruling. We do not consider sanctions appropriate in this case. *Dorsett v. Moore,* 2003 WY 7, ¶¶ 13–14, 61 P.3d 1221, ¶¶ 13–14 (Wyo.2003); *Wood v. Wood,* 964 P.2d 1259, 1268 (Wyo.1998).

## CONCLUSION

[¶ 25]   The district court did not err in denying the motion for mistrial.   The district court's custody determination was not based solely upon gender and was not contrary to the evidence.   The district court did not make an oral ruling that Father was entitled to at least 40% of the children's time.   We decline to impose sanctions or award attorney's fees in this matter.   The Decree of the district court is affirmed in all respects.